370 F.3d 1108
 ALTX, INC., DMV Stainless Usa, Inc., Salem Tube, Inc., Sandvik Steel Co., and Pennsylvania Extruded Tube Company, Plaintiffs-Appellants, and
American Extruded Products Corp. and United Steelworkers of America, AFL-CIO/CLC, Plaintiffs,
v.
UNITED STATES and United States International Trade Commission, Defendants-Appellees, and
Sumitomo Metal Industries, Ltd., Nippon Steel Corporation, Kawasaki Steel Corporation, Kobe Steel Ltd., Sanyo Special Steel Company, and NKK Corporation (now known as NKK Tubes), Defendants-Appellees.
 No. 03-1320.
 United States Court of Appeals, Federal Circuit.
 June 2, 2004.
 
 R. Alan Luberda, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were David A. Hartquist and Jeffrey S. Beckington.
 Rhonda M. Hughes, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendants-appellees United States, et al. With her on the brief were Lyn M. Schlitt, General Counsel; and James M. Lyons, Deputy General Counsel.
 John D. Greenwald, Wilmer, Culter & Pickering, of Washington, DC, argued for defendants-appellees Sumitomo Metal Industries, Ltd., et al. With him on the brief were Robert C. Cassidy, Jr., Leonard M. Shambon and Lynn M. Fischer.
 Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.
 SCHALL, Circuit Judge.
 
 
 1
 This is an antidumping case. Plaintiffs-Appellants Altx, Inc., DMV Stainless USA, Inc., Salem Tube, Inc., Sandvik Steel Company, and Pennsylvania Extruded Tube Company (collectively, "Altx" or the "domestic producers") appeal from the final decision of the United States Court of International Trade, Altx, Inc. v. United States, 25 I.T.R.D. (BNA) 1028 (Ct. Int'l Trade 2002) ("Altx III"), that affirmed a final negative injury determination by the International Trade Commission ("Commission"), Certain Circular Seamless Stainless Steel Hollow Products from Japan, USITC Pub. 3532, Inv. No. 731 TA 859 (Int'l Trade Comm'n Aug. 26.2002) (views on second remand) ("Second Remand Determination").
 
 
 2
 Altx asks us to set aside the decision in Altx III, the Second Remand Determination, and a prior remand order of the Court of International Trade, Altx, Inc. v. United States, 24 I.T.R.D. (BNA) 1643 (Ct. Int'l Trade 2002) ("Altx II"), in order to reinstate an earlier determination of the Commission, Circular Seamless Stainless Steel Hollow Products from Japan, USITC Pub. 3475, Inv. No. 731-TA-859 (Int'l Trade Comm'n Dec. 3, 2001) (remand) ("First Remand Determination"). The First Remand Determination affirmatively found injury to the domestic industry. Altx contends that, because the First Remand Determination was supported by substantial evidence, it was improper for the Court of International Trade to remand the case to the Commission in Altx II. In the alternative, Altx asks us to reverse the Second Remand Determination on the ground that it is unsupported by substantial evidence, and to remand the case for further proceedings before the Commission.
 
 
 3
 Defendants-Appellees, Sumitomo Metal Industries, Ltd., Nippon Steel Corp., Kawasaki Steel Corp., Kobe Steel Ltd., and Sanyo Special Steel Co. (collectively, the "Japanese producers"), argue that Altx III and the Second Remand Determination should be affirmed.
 
 
 4
 Because the Court of International Trade's decision in Altx II was not an abuse of its discretion, and because the Second Remand Determination, which the Court of International Trade sustained in Altx III, is supported by substantial evidence, we affirm.
 
 BACKGROUND
 I.
 
 5
 The antidumping laws protect United States industries against the domestic sale of foreign manufactured goods at prices below the fair market value of those goods in the foreign country. Aimcor v. United States, 141 F.3d 1098, 1101 (Fed.Cir.1998); see also Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1368 (Fed.Cir.2002) ("Under the statutory scheme established by the Tariff Act of 1930... American industries may petition for relief from imports that are sold in the United States at less than fair value (`dumped'), or which benefit from subsidies provided by foreign governments."). If a less than fair value sale of imported goods results in actual or threatened injury to the corresponding domestic industry, a duty may be imposed on the imported merchandise. Micron Tech., Inc. v. United States, 117 F.3d 1386, 1389 (Fed.Cir.1997). The duty is "equal to the amount by which the normal value exceeds the export price ... for the merchandise."[1] RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1337 (Fed.Cir.2002) (quoting 19 U.S.C. § 1673 (2000)).
 
 
 6
 An antidumping investigation is initiated when the domestic industry petitions the Department of Commerce ("Commerce") to investigate allegations of dumping by foreign manufacturers. Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed.Cir.2002). After Commerce confirms that the petition "contains information ... supporting the allegations," 19 U.S.C. § 1673a(c)(1)(A)(i) (2000), it makes a preliminary determination as to whether the imported merchandise is being sold, or is likely to be sold, at less than fair value. Id. § 1673(1). While Commerce is making its preliminary determination, the Commission makes a preliminary determination as to whether there is a "reasonable indication" that an industry in the United States is "materially injured or is threatened with material injury ... by reason of imports of the subject merchandise [or] that imports of the subject merchandise are not negligible." Id. § 1673b(a)(1). If either of the Commission's preliminary determinations is in the negative, the antidumping investigation is terminated. If the investigation is not terminated, Commerce makes its final determination "as to whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value." Id. § 1673d(a)(1). At the same time, the Commission finalizes its determination as to the existence or threat of material injury. Id. § 1673d(b)(1). If both the injury inquiry by the Commission and the less than fair value determination by Commerce are "answered in the affirmative," Commerce issues the appropriate final antidumping order. Duferco Steel, 296 F.3d at 1089; see 19 U.S.C. § 1673d(c)(2) (2000).
 
 
 7
 A final determination by the Commission can be appealed to the Court of International Trade, which reviews the Commission's findings to ensure that they are not "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2000). Should the court determine that the Commission's determination is unsupported by substantial evidence or otherwise incorrect, the case will be remanded to the Commission with specific instructions, pursuant to 19 U.S.C. § 1516a.[2] Otherwise, the Court of International Trade will affirm the Commission's findings, paving the way for an appeal to this court. Commerce's final determination also can be appealed to the Court of International Trade. Id. There, it is reviewed under the same standard that applies to the Commission's final determination. Id. § 1516a(b)(1)(B)(i); see Yancheng Baolong Biochemical Prods. Co. v. United States, 337 F.3d 1332, 1333 (Fed.Cir.2003). Only the Commission's final determination in this case is at issue. Commerce's final determination is not before us.
 
 II.
 
 8
 This case has a long and complicated history, involving three determinations by the Commission and three corresponding Court of International Trade decisions.
 
 A.
 
 9
 The goods at issue are circular seamless stainless steel hollow products ("CSSSHPs"), of which there are two types, hot- and cold-finished. Production of either type begins with an unfinished stainless steel billet. A central cavity is formed using a hot extrusion process to drill an axial hole through the entire billet. The billet is then heated, and a die is forced through the hole to expand the cavity. The final step in the production of a hot-finished CSSSHP is to reheat the billet and force it through a die and over an internal mandrel. If the resulting product requires a close dimensional tolerance or a smooth finish, an additional cold-finishing process is conducted. In that case, the hot-finished CSSSHP (referred to as "redraw hollow" when used as an input for a cold-finished CSSSHP) must undergo cold-tube reducing or cold-drawing. These processes require the hot-finished CSSSHP to be pulled through a die, usually with an internal plug or mandrel that forms the inside of the tube. In the investigation that is before us, the Commission treated hot- and cold-finished CSSSHPs as a single domestic like product.
 
 B.
 
 10
 Domestic, European, and Japanese producers all supply the U.S. market for CSSSHPs. Domestic CSSSHP producers can be grouped into two categories: independent producers of cold-finished CSSSHPs, and U.S. subsidiaries of European companies that produce both hot- and cold-finished CSSSHPs. On October 26, 1999, the latter group instigated the present investigation by petitioning Commerce to review the impact of sales of Japanese CSSSHP imports ("subject imports") beginning in 1997. In conducting its part of the investigation, the Commission collected industry and shipment data for subject imports, as well as for CSSSHPs imported from non-Japanese producers ("non-subject imports"). The Commission used this data to create a statistical model that correlated the level of subject imports with the health of the domestic industry ("COMPAS"). Because many of the results predicted by the COMPAS model were contradicted by empirical data, the Commission declined to include the model in its final determination.
 
 
 11
 In August 2000, having found that the domestic CSSSHP industry was not materially injured nor threatened with material injury by reason of subject imports during the period covered by the investigation, the Commission announced its final negative determination. Circular Seamless Stainless Steel Hollow Products from Japan, USITC Pub. 3344, Inv. No. 731-TA-859 (Int'l Trade Comm'n Aug. 2000) (Final) ("Final Determination"). By a 4-2 vote, the Commission found that the statutory factors for injury were not met.[3] The Commission concluded that the volume, the price effects, and the overall economic impact of subject imports were not individually significant and did not cause material injury to the performance of the domestic CSSSHP industry.
 
 
 12
 In evaluating the volume of subject imports, the Commission was persuaded by declines in the quantity, value, and market share of subject imports between 1998 and 1999, and again between interim 1999 and interim 2000. Although subject import volume rose sharply between 1997 and 1998, it decreased consistently after that period. The Commission thus concluded that subject import volume was not significant during the period 1997-2000.
 
 
 13
 Next, the Commission assessed the price effects of the subject imports on the domestic industry, by evaluating (a) the significance of price underselling of the subject imports relative to like domestic products, and (b) the price depression and/or suppression caused by that underselling. Though underselling was prevalent, the Commission determined that corresponding price effects were minimal and could be attributed to significant declines in raw material costs and the "softening" of domestic demand, rather than to the low price of subject imports.[4] Finally, in measuring the impact of subject imports on the domestic industry, the Commission weighed a number of factors before concluding that "[d]espite the mixed overall performance of the domestic industry, its financial picture actually improved from 1997 to 1998, when subject imports registered their most significant increase, and remained above the 1997 level in 1999 as subject imports fell and nonsubject imports gained a substantial share of the domestic market." Final Determination, at 19. Because a negative correlation between subject imports and the financial performance of the domestic producers could not be proven, the impact of imports on the industry was deemed insignificant. In the absence of findings of significance for any of the three statutory factors required by section 1677(7)(C), the Commission reached a final negative determination of no material injury.
 
 C.
 
 14
 Altx appealed the Commission's final negative determination to the Court of International Trade, which remanded the case to the Commission for reconsideration. ALTX, Inc. v. United States, 167 F.Supp.2d 1353 (Ct. Int'l Trade 2001) ("ALTX I"). The court took this action mainly because it was troubled by the Commission's failure to include in the final determination with respect to injury "an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties...." Id. at 1359 (quoting 19 U.S.C. § 1677f(i)(3)(B) (2000)). Accordingly, the court remanded the case to the Commission with the direction that it explicitly consider arguments made by Altx:
 
 
 15
 While the ITC need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermines its reasoning and conclusion. When considered individually every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole, the court finds that the ITC decision is not substantially supported and explained. On remand the agency must, consistent with this opinion, reconsider its volume, price effects, and impact findings, and upon doing so, must re-evaluate its determinations regarding present material injury and threat of material injury.
 
 
 16
 Id. at 1374. The Court of International Trade highlighted specific areas where it believed additional explanation was required. First, the court instructed the Commission to support its decision not to rely on the COMPAS economic model. Second, having found that the Commission had impermissibly conflated the two distinct prongs of the price effects analysis (the significance of underselling and the causal connection, if any, between subject imports and price depression or suppression), the court stated that it was necessary for the Commission to reconsider "whether a lack of correlation between underselling and the condition of the domestic industry remains." Id. at 1366. The court also instructed the Commission to explain its finding of no price suppression or depression. Id. at 1369. Finally, the court directed the Commission to address Altx's challenges to the impact analysis. Altx urged that the Commission had improperly ignored the findings of the Commission's Staff Report and had erroneously relied on non-representative data in characterizing the health of the domestic industry. Altx also urged that the Commission had improperly failed to evaluate the domestic industry in light of semi-annual (as opposed to annual) data. Id.
 
 D.
 
 17
 On remand, a new Commission majority[5] reversed the initial position of the Commission and entered an affirmative determination of injury. First Remand Determination, at 2. The Commission did not hold further hearings, request supplementary briefing, or gather additional evidence, before it arrived at this conclusion. Instead, the dispositive factor was the replacement of one of its members, Commissioner Thelma Askey, who had initially voted against a finding of injury, with a new member, Commissioner Denis Devaney, who voted to join the original dissent. Thus, the vote on remand was tied 3-3 (with all original Commissioners maintaining their earlier positions). By statute, this meant that there was deemed to be a final affirmative injury determination. See 19 U.S.C. § 1677(11) (2000). The Final Determination dissent (drafted by the two original members of the new Commission majority) was reissued as the decision for the First Remand Determination. The Final Determination majority dissented from the First Remand Determination and wrote separately to again reach a determination of no injury, this time addressing the issues raised by the Court of International Trade in the ALTX I remand order.
 
 
 18
 The new Commission majority concluded that, because the quantity of subject imports doubled between 1997 and 1998 and continued to exceed shipments of the domestic industry in 1999, subject import volume was significant. In the new Commission majority's view, the increase in subject import volume was the reason for the decrease in the domestic industry's U.S. shipments, notwithstanding an increase in domestic demand. Alternate explanations for the persistent underselling of subject imports, such as the decline in the price of input materials, failed to persuade the new Commission majority, which found price effects to be significant. In so finding, the new Commission majority dismissed the argument that the price data sample was too limited to be sufficiently representative of the overall U.S. market environment. Finally, because domestic production, shipments, and prices had all fallen, the new Commission majority inferred that the domestic industry had been significantly impacted by subject imports. Contrary to the conclusion in the Final Determination, the new Commission majority characterized the periods of improvement in the domestic industry as "brief" and not affecting the "bottom line." Rather, it emphasized evidence it thought linked declines in performance of the domestic industry in 1998 and 1999 to the surge in subject imports.
 
 E.
 
 19
 The Japanese producers appealed the affirmative First Remand Determination to the Court of International Trade, arguing that "the [new] Commission majority did not adequately address material arguments raised in ... post-hearing briefs, and drew conclusions of fact that do not fairly reflect evidence on the record." Altx II, 24 I.T.R.D. (BNA) at 1644. The Court of International Trade agreed, and again remanded the case with specific instructions for further action by the Commission. First, the court instructed the Commission to consider the significance of subject import volume within the context of the conditions of competition. The court explained, "The Commission does not comply with its statutory mandate by simply describing various conditions of competition in isolation. `Congress, this court, and ITC itself have repeatedly recognized that it is the significance of a quantity of imports, not absolute volume alone, that must guide ITC's analysis....'" Id. at 1651 (quoting USX Corp. v. United States, 655 F.Supp. 487, 490 (Ct. Int'l Trade 1987) (emphasis in original)). On the issue of price effects, the court remanded for more extensive consideration of arguments made by the Japanese producers pertaining to the correlation between underselling and the condition of the domestic industry, as well as an alleged lack of record evidence for price suppression or depression. Finally, the Court of International Trade noted two points it said the new Commission majority had not thoroughly considered in its finding of significant impact: first, the effect on the domestic industry of the bankruptcy of a large domestic producer, and second, the relationship between the increase in non-subject import volume during the period 1997-1999 and domestic performance. Id. at 1656-59.
 
 F.
 
 20
 On the second remand, the Commission voted 3-2 to reverse the First Remand Determination, and it reinstated its original no-injury determination. Second Remand Determination, at 2. No Commissioner changed his or her vote; instead, the temporary appointment of Commissioner Devaney (who had provided the decisive vote in the First Remand Determination) had expired, reversing the outcome. The dissent from the First Remand Determination (drafted by the original Commission majority in response to the Court of International Trade's decision in ALTX I) was adopted as the majority view in the Second Remand Determination. Id. (incorporating "views as set forth in response to court's first remand order"). In that opinion, the Commission reiterated all of its original conclusions, but, in conformity with the ALTX I remand order, addressed in greater depth the arguments made by domestic producers.
 
 
 21
 The domestic producers appealed the second negative determination to the Court of International Trade. In Altx III, the court affirmed the Second Remand Determination, because "the Commission complied with the court's instructions in ALTX I to `address significant arguments and evidence which seriously undermines its reasoning and conclusions.'" Altx III, 25 I.T.R.D. (BNA) at 1040 (quoting ALTX I, 167 F.Supp.2d at 1374).
 
 
 22
 This appeal followed.
 
 ANALYSIS
 I.
 
 23
 Pursuant to 28 U.S.C. § 1295(a)(5), this court has jurisdiction over "an appeal from a final decision of the United States Court of International Trade." When, as in this case, a series of related Commission determinations and Court of International Trade decisions are presented for our review, our jurisdiction attaches as the result of a final Court of International Trade decision (such as Altx III), but nonetheless encompasses the entirety of the proceedings before the court, including intermediate remand orders that would not, independently, be appealable. See, e.g., Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1303-06 (Fed.Cir.2004); Taiwan Semiconductor Indus. Assoc. v. Micron Tech., Inc., 266 F.3d 1339, 1344 (Fed.Cir.2001). Section 1295(a)(5) thus provides us with authority to review the decision of the Court of International Trade in Altx III, as well as any antecedent questions raised by the parties in connection with the court's decisions in ALTX I and II.
 
 
 24
 We consider first the appropriate standard of review for each "link" of the Altx "chain." We begin with the language of the Court of International Trade's relevant jurisdictional statute, 19 U.S.C. § 1516a(b)(1)(B)(i). Under that section, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record or otherwise not in accordance with law...." For our part, we review the Court's evaluation of the Commission's factual determinations "by stepping into the shoes of the Court and duplicating its review, evaluating whether Commission determinations are unsupported by substantial evidence or otherwise not in accordance with law." Allegheny, 287 F.3d at 1370 (citations omitted). Because we focus on the validity of the Commission's determination, our de novo posture essentially repeats the Court of International Trade's review for substantial evidence; however, "we will not ignore the informed opinion of the Court of International Trade." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed.Cir.1994) (observing that the opinion of the Court of International Trade deserves "due respect").
 
 
 25
 The parties agree, correctly, that our de novo review of the Court of International Trade's final decision in Altx III requires that we consider whether the Commission's Second Remand Determination is supported by "substantial evidence." Substantial evidence requires "more than a mere scintilla," Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed.Cir.1984), but is satisfied by "something less than the weight of the evidence." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed.Cir.1984) (citations omitted). Importantly, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Id. (internal quotation marks and citations omitted).
 
 
 26
 The parties disagree, however, as to the appropriate standard for any review of the Court of International Trade's ALTX I and II remand orders. Altx contends that the "substantial evidence" standard should apply uniformly to both the interlocutory remand orders and the final decisions of the court. The Japanese producers and Commission contend that a more deferential "abuse of discretion" standard is required when a Court of International Trade order does not reach the sufficiency of the evidence supporting the Commission's determination, but instead remands only for further explanation or clarification of the Commission's position. See Taiwan Semiconductor, 266 F.3d at 1344.
 
 
 27
 In Taiwan Semiconductor, the Court of International Trade neither affirmed nor reversed an affirmative injury determination by the Commission, but merely remanded the matter for additional "explanation" that would clarify the Commission's findings. Id. Because the court did not squarely address the sufficiency of the evidence supporting the Commission's determination, we applied an "abuse of discretion" standard in our review:
 
 
 28
 In the present case, the Court of International Trade did not find that the Commission's first determination was not supported by substantial evidence or that the Commission did not make its determination in accordance with law. In other words, the trial court performed no substantial evidence review at all for this court to review. The Court of International Trade also did not request the Commission to perform any further investigation. Rather, the court remanded the Commission's determination for further explanation.
 
 
 29
 . . .
 
 
 30
 The Supreme Court has explained: "If the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course ... is to remand to the agency for additional investigation or explanation." A court's judgment as to whether the record before it needs further explanation in order for the court to understand and properly evaluate the agency's action is a determination that lies within the discretion of the court. Thus this court reviews the Court of International Trade's decision to remand for a further explanation from the Commission for abuse of discretion.
 
 
 31
 Id. (citations omitted).
 
 
 32
 Our reasoning in Taiwan Semiconductor controls our review of ALTX I and II. Here, as in Taiwan Semiconductor, neither of the Court of International Trade's remand decisions required additional investigation by the Commission, nor did either of the remand decisions alter a Commission determination in any substantive regard. On the contrary, the remand decisions only instructed the Commission to (1) further consider the relevant arguments made by the parties, (2) explain in greater detail its decision and reasoning, or (3) reinterpret the evidence in some limited manner. As in Taiwan Semiconductor, the court simply "request[ed] ... further explanation of agency action," id., and did not evaluate the substantiality of the Commission's evidence. Therefore, any review of ALTX I and II in this case is under an abuse of discretion standard.
 
 II.
 
 33
 Altx asks us, through review of Altx III, to effectively do one of two things: (i) affirm the intermediate First Remand Determination or (ii) vacate and remand the negative Second Remand Determination to the Commission for further proceedings. Because the First Remand Determination was supported by substantial evidence and in accordance with law,[6] Altx argues, the Court of International Trade erred in its remand order in Altx II. To remedy this alleged error, Altx would have this court essentially ignore the Second Remand Determination and the Altx III affirmance because, had the First Remand Determination been properly upheld, these additional proceedings would not have taken place.
 
 
 34
 Alternatively, should we choose not to disturb the decision in Altx II to remand the First Remand Determination, Altx urges there are a number of reasons why the Second Remand Determination is not supported by substantial evidence, so that a further remand to the Commission is in order. First, Altx contends that the Commission still has not sufficiently "explain[ed] how and why the results of COMPAS did not undermine its conclusions." Nor, according to Altx, has the Commission supported its rejection of the COMPAS model with evidence that indicates the model is "inherently flawed, unreliable, or inaccurate." Altx suggests that the Commission's rejection of the COMPAS model was improperly premised on its disagreement with the dumping margin chosen by Commerce.[7] Second, Altx states that "the Commission's determination, which relies on a temporal coincidence between trends in non-subject imports and the condition of the domestic industry, does not establish a causal disconnect between subject imports and injury to the domestic industry." Alternatively, Altx asserts that it is not enough for the Commission to show that non-subject imports injured the domestic industry. Rather, it must also show that "the impact of the non-subject imports is significant enough that it severs the causal link between subject imports and the conditions of the industry." Finally, Altx challenges the Commission's decision not to rely on specially collected, semi-annual data that evidenced injury to the domestic industry. Altx argues that the Commission's findings cannot rest on annual data alone if conflicting semi-annual data exists; this alternate data set must also be considered.
 
 
 35
 We address each of Altx's contentions in turn.
 
 III.
 
 36
 We turn first to Altx's challenge to the Court of International Trade's decision in Altx II to remand the First Remand Determination.[8] At the outset, we note that the First Remand Determination, drafted prior to the ALTX I decision, did not respond specifically to the concerns raised by the Court of International Trade in its first remand order. The dissent from the Final Determination was adopted by the new Commission majority despite earlier criticism from the court, which, at oral argument, had described that opinion as potentially not "upholdable" and "equally bad" as the Final Determination majority opinion.
 
 
 37
 Altx nonetheless takes the position that the second remand was both unnecessary and in error because the answers to the questions raised by the Court of International Trade in Altx II were already contained within the First Remand Determination. Altx argues that the court improperly inquired into how the new Commission majority reached its decision, rather than merely confirming that the findings were in accord with substantial evidence. We disagree. In our view, the Court of International Trade's decision to remand was justified on numerous grounds. We note, in particular, the new Commission majority's deficient treatment of non-subject imports and the ALTech bankruptcy in the First Remand Determination.
 
 
 38
 The new Commission majority's inconsistent weighing of subject and non-subject imports engendered a basis for remand. In the First Remand Determination, the new Commission majority noted the large volume of non-subject imports, but found that those imports did not compete with domestic like product. At the same time, although the volume of subject imports was similar, the new Commission majority came to an opposite finding for those products. The Court of International Trade stated that "it [was] not clear why a similar percentage (approximately 20%) of subject imports not produced by the domestic industry supported the opposite conclusion in determining the significance of subject import volume." Altx II, 24 I.T.R.D. (BNA) at 1660-61. For this reason, the case was remanded, with the direction that the inconsistency be explained. Id. at 1661. As in ALTX I, the court reasonably was troubled by the failure to consider all relevant arguments-this time, those made by the Japanese producers, who had suggested a close correlation between the volume of non-subject imports and the performance of the domestic industry. Id. at 1662. The court instructed the Commission to evaluate the merits of this position on remand. Id.
 
 
 39
 Altx relies on a collection of scattered references throughout the record to support its argument that the position of the new Commission majority in the First Remand Determination was entirely clear, so that a remand for further explanation was unnecessary. We do not agree. In addition to containing the requirement that the Commission address all relevant arguments made by the parties, 19 U.S.C. § 1677f(i)(2)(B) instructs that the Commission's determination must include "the primary reasons for the determination" and "considerations relevant to the determination of injury." If these statutory criteria are not met in a clearly discernible manner, the Court of International Trade properly may remand for necessary explanation. At best, the evidence presented by Altx in this case allows an inference as to the possible reasoning of the new Commission majority. It does not, as the statute suggests, explicitly set forth "relevant considerations" or the Commission's "primary reason[ing]." Thus, the court was entirely within its discretion in remanding the case for further explanation.
 
 
 40
 An additional ground supports the Court of International Trade's remand in Altx II. The new Commission majority failed to address the possible relationship between the bankruptcy of a large domestic producer, ALTech, and the poor performance of the domestic industry. In determining whether a domestic industry has been injured, the Commission must distinguish between harm that is caused by imports and harm that is caused by other factors; in determining injury, it cannot attribute to imports the impact of other factors. See Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade (relating to antidumping), Statement of Administrative Action at 181, H.R.Rep. No. 103-826, at 835 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4172 (referencing the Uruguay Round Antidumping Agreement, whose Art. 3.5 reads, "The authorities shall also examine any known factors other than dumped imports ..."). The Japanese producers presented evidence that the ALTech bankruptcy significantly contributed to declines in domestic production.[9] Yet, this matter was not discussed in the First Remand Determination. Altx's position is that so long as the new Commission majority was aware of the bankruptcy,[10] it is of no consequence that it chose not to mention it in its determination. It is true that the Commission is obligated to look at the domestic industry "as a whole." See Acciai Speciali Terni, S.p.A. v. United States, 19 C.I.T. 1051, 1063-64 (1995). That does not mean, however, that it was unreasonable for the Court of International Trade to be concerned about the failure of the First Remand Determination to discuss the ALTech bankruptcy. The court explained,
 
 
 41
 [e]valuating the domestic industry "as a whole," however, is not a license to ignore information that would give context and meaning to the data it is analyzing in assessing the domestic industry's performance. Indeed, the statutory directive to analyze the industry "as a whole" compels an evaluation of all material factors raised by the parties that would render a more accurate reading of the health of the industry. Therefore, if the Commission determines to discount a particular factor that bears on the relevant financial indicators, it must give substantial evidence to support its reasoning. The court finds that the Commission has failed to do so.
 
 
 42
 Altx II, 24 I.T.R.D. (BNA) at 1658-59. The Court of International Trade's remand order in Altx II is consistent with the statutory directive precluding consideration of impact caused by factors other than subject imports. Because the record evidence does not show that the new Commission majority considered the ALTech bankruptcy, the Court of International Trade's remand order was not an abuse of discretion.
 
 
 43
 We decline to disturb the decision of the Court of International Trade in Altx II. Accordingly, we do not reach Altx's argument that the First Remand Determination was supported by substantial evidence.
 
 IV.
 
 44
 Having concluded that the First Remand Determination should not be reinstated, we turn to Altx's second argument — that the Second Remand Determination is not supported by substantial evidence. In making this argument, Altx points to what it says are three deficiencies in the Second Remand Determination.
 
 
 45
 First, Altx continues to assert that the Commission has not reasonably explained why the COMPAS economic model does not stand in the way of its determination of no injury. Altx disputes the Commission's explanation of the shortcomings of the COMPAS model offered in the Second Remand Determination. Altx argues that the Commission has failed to "explain how and why the results of COMPAS did not undermine its conclusions." Altx also suggests that the Commission's rejection of the COMPAS model resulted simply from its disagreement with the dumping margin chosen by Commerce. Altx's second argument against the Second Remand Determination is that "the Commission's determination, which relies on a temporal coincidence between trends in non-subject imports and the condition of the domestic industry, does not establish a causal disconnect between subject imports and injury to the domestic industry." Altx believes that even if non-subject imports are significant, subject imports can nonetheless remain significant within the domestic industry. Thus, according to Altx, the Commission may not find simply that non-subject imports injured the domestic industry; it also must find that the impact of non-subject imports is significant enough that it severs the causal link between subject imports and the conditions of the industry. Altx's final challenge to the Second Remand Determination is that the Commission improperly failed to consider semi-annual data it specially collected for the purposes of the antidumping investigation, in addition to the annual data it conventionally uses.
 
 
 46
 Under the "substantial evidence" standard, we must affirm a Commission determination if "it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Atlantic Sugar, 744 F.2d at 1562-64. For the reasons that follow, we agree with Japanese producers and the Commission that substantial evidence supports the views of the Commission on each of the matters raised by Altx on appeal. Accordingly, finding neither legal error nor insufficient evidence in the Commission's Second Remand Determination, we affirm the decision of the Court of International Trade in Altx III.
 
 
 47
 First, it is within the Commission's discretion to refuse to abide by a theoretical economic model that proves inconsistent with empirical data. The Commission is not required to utilize the COMPAS model; it is merely one of several inputs it typically considers. See Altx III, 25 I.T.R.D. (BNA) at 1034 ("COMPAS is merely one tool available to the Commission, and the model alone cannot substitute for consideration of the statutory factors and the record data."). The concern underlying the Court of International Trade's remand in ALTX I — that the Commission had not adequately addressed the domestic producers' arguments regarding the exclusion of the COMPAS model — was cured by the Commission in its Second Remand Determination. There, the Commission fully explained its reasons for not relying on the COMPAS model:
 
 
 48
 In its opinion, the Court raised questions as to our treatment of the Commission's economic model (COMPAS) in this investigation. While we are mindful of the petitioners' arguments raised in their final comments with respect to the Commission's economic model, we did not rely on it in assessing the impact of subject imports on this industry. We have closely examined the empirical data in the record and determined it to be more useful than conclusions based on the results of the COMPAS model. While COMPAS has been a tool available to the Commission, it alone is not a substitute for considering the factors specified in the statute and the data on the record. The Court has repeatedly recognized that the Commission may reasonably reach a conclusion based upon the facts in the record that vary from a theoretical economic model, and the Commission's findings regarding volume of subject imports and causation are not undermined by the results of the COMPAS model in this investigation. In fact, it is well settled that economic models "based on a set of assumptions, may be outweighed by real world data." In this investigation in particular, we find this to be the case.
 
 
 49
 Second Remand Determination, at 8. The Court of International Trade found this explanation to be sufficient to satisfy the requirement of 19 U.S.C. § 1677f(i)(3)(B) that the Commission include in its final determination of injury "an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties ... concerning volume, price effects, and impact on the industry of imports of the subject merchandise."[11] We decline to disturb the Commission's decision.
 
 
 50
 We also do not believe that the Commission's disagreement with the dumping margin chosen by Commerce led to the rejection of the COMPAS model. Pursuant to 19 U.S.C. § 1677(7)(C)(iii)(V), the Commission is required to consider, as part of its impact analysis, the dumping margin calculated by Commerce. The statute states: "In examining the impact required to be considered ... the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to ... the magnitude of the margin of dumping." 19 U.S.C. § 1677(7)(C)(iii)(V) (2000). However, Altx has pointed to nothing but conjecture to support its argument that the Commission's decision not to incorporate the COMPAS results was in some way premised on its alleged disagreement with the margin chosen by Commerce. In fact, after explicitly recognizing that the Commission must consider the dumping margin as part of its analysis, the Court of International Trade characterized COMPAS as "merely one tool available to the Commission," which remains free to "base [its] decision upon facts in the record that vary from a theoretical economic model." Altx III, 25 I.T.R.D. (BNA) at 1034. We agree with the court that "the model alone cannot substitute for consideration of the statutory factors and the record data." Id. Here, the Commission fully complied with its statutory duty by at least "consider[ing] ... the magnitude of the margin of dumping."[12] 19 U.S.C. § 1677(7)(C)(iii)(V) (2000) (emphasis added). We decline to ask more of the Commission than required by the statute.
 
 
 51
 Neither do we find persuasive Altx's arguments regarding the weight attributed to non-subject imports. The Commission is not required to determine that non-subject imports are significant in order to conclude the subject imports are not significant. See Id. § 1677(7)(B); Gerald Metals, Inc. v. United States, 132 F.3d 716, 719-20 (Fed.Cir.1997). Non-subject import volume is just one of numerous factors the Commission may consider in its evaluation of the causal relationship between subject imports and domestic industry performance. The Commission's finding that the increase in non-subject imports may have contributed to the decline of the domestic industry permits an inference that subject imports were unlikely to have caused the decline. In the Second Remand Determination, the Commission expanded on why it had reached this conclusion in the Final Determination, thereby eliminating the ground for remand the Court of International Trade noted in ALTX I.[13] While Altx may disagree with the conclusions drawn by the Commission and offer reasonable, alternate explanations for the role of non-subject imports in the decline of the CSSSHP industry, it is not the role of this court to "refind[] the facts ... or interpos[e] its own determinations on causation or material injury." Nippon, 345 F.3d at 1381. We review the Commission's findings only to ensure that they are without legal error and supported by substantial evidence. We find that that is the case here.
 
 
 52
 Finally, the Commission's decision to rely solely on annual data does not justify a remand. It was entirely reasonable for the Commission to reject the semi-annual data, given the risk that it was incomplete, unrepresentative, or inaccurate. Altx cannot require the Commission to consider all data, especially if there is the possibility that the data is misleading.
 
 CONCLUSION
 
 53
 We hold that the Court of International Trade did not abuse its discretion when it remanded the First Remand Determination to the Commission. We further hold that the Second Remand Determination is supported by substantial evidence and is free of legal error. The decision of the Court of International Trade in Altx III is therefore
 
 
 54
 AFFIRMED.
 
 
 55
 Each party shall bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 The "normal value" is "the price at which the subject merchandise is first sold ... for consumption in the exporting country...." 19 U.S.C. § 1677b (2000). The "export price" is "the price at which the subject merchandise is first sold ... in the United States...."Id. § 1677a.
 
 
 [2]
 Section 1516a limits the Court of International Trade to affirmances and remand orders; an outright reversal without a remand does not appear to be contemplated by the statute: "If the [Court of International Trade's] final disposition of an action brought under this section is not in harmony with the published determination... [of] the Commission, the matter shall be remanded to ... the Commission, as appropriate, for disposition consistent with the final disposition of the [Court of International Trade]."See Nippon Steel Corp. v. ITC, 345 F.3d 1379, 1381 (Fed.Cir.2003) (holding that the Court of International Trade abused its discretion by declining to remand the case to the Commission for further proceedings).
 
 
 [3]
 The factors are set forth in 19 U.S.C. § 1677(7)(C):
 (i) Volume — In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.
 (ii) Price — In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether — (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.
 (iii) Impact on affected domestic industry — In examining the impact required to be considered under § 1677(7)](B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to — (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity, (II) factors affecting domestic prices, (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including the efforts to develop a derivative or more advanced version of the domestic like product, and (V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping. The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.
 
 
 [4]
 The government explains that "[w]hile there was extensive underselling by subject imports, much of it occurred in quarters when domestic prices were stable or rising, indicating a lack of price depression or suppression."
 
 
 [5]
 To avoid confusion, when referring to determinations by the Commission, we refer to theFinal Determination dissenters, who became the majority in the First Remand Determination, as the "new Commission majority." We refer to the majority in the Final Remand Determination and the Second Remand Determination as the "Commission."
 
 
 [6]
 Altx's arguments relating toAltx II are framed with the "substantial evidence" standard of review in mind. As discussed, we agree with the Japanese producers and the Commission that the Taiwan Semiconductor case correctly states the standard of review as abuse of discretion. From this point forward, we take the liberty of rephrasing Altx's argument so that we may be consistent with that standard.
 
 
 [7]
 Unlike the Commission's, Commerce's final determination was affirmative. It determined that subject merchandise was being sold in the United States at less than fair value, and proposed dumping margins of 156.81% for Sanyo Special Tube and Sumitomo Metal Industries, and 62.14% for all other CSSSHP producersCircular Seamless Stainless Steel Hollow Products From Japan, 65 Fed.Reg. 42,985, 42,986 (Dep't Commerce July 12, 2000) (notice of determination).
 
 
 [8]
 InTung Mung Development Co., Ltd. v. United States, 354 F.3d 1371 (Fed.Cir.2004), Commerce arrived at antidumping determinations for two Taiwanese steel companies. There followed (i) appeals to the Court of International Trade; (ii) in each case, a remand order by the court; (iii) on remand, redeterminations by Commerce, in which Commerce adopted a policy different from the one it had followed in its original determinations (use of combination antidumping rates as opposed to weighted average antidumping rates); (iv) affirmances of the remand redeterminations by the Court of International Trade; and (v) appeals from the final decisions of the Court of International Trade. On appeal, the appellants urged us to reverse the Court of International Trade's remand orders and to "reinstate" Commerce's original determinations. We declined to do so, stating that "[e]ven assuming that the Court of International Trade's remand orders were erroneous, those errors did not survive Commerce's decisions on remand to adopt a new policy." Id. at 1378-79. We explained: "[A]ny error in the remand orders is irrelevant because Commerce's redetermination decisions represent new, independent agency interpretations." Id. at 1379. This case is different from Tung Mung. In this case, there has been no independent policy change by the Commission. Under these circumstances, the decision of the Court of International Trade in Altx II has, in the parlance of Tung Mung, "survived" for our review.
 
 
 [9]
 Altx II points to the claim made by Japanese producers that "when the effects of the ALTech bankruptcy are removed from the analysis, domestic CSSSHP production actually rises, albeit slightly, between 1997 and 1999." 24 I.T.R.D. (BNA) at 1658.
 
 
 [10]
 Altx relies on Commission testimony of a former ALTech employee that briefly mentions the bankruptcy to show that the new Commission majority was aware of the ALTech issue
 
 
 [11]
 InAltx III, the Court of International Trade evaluated the Commission's response to the relevant arguments of domestic producers that urged inclusion of the COMPAS results. The court found that
 the ITC's Second Remand Determination is in compliance with the court's directions in ALTX I and that its rejection of results of the COMPAS model is reasonable and supported by substantial evidence. The determination explains in substantial detail why, in this investigation, the Commission viewed the theoretical COMPAS model, which was based on suspect margins, to be less helpful than the other data of record. The Commission has therefore complied with the court's instructions in ALTX I by providing a rational explanation for its rejection of the results of the COMPAS model.
 Altx III, 25 I.T.R.D. (BNA) at 1035.
 The COMPAS model incorporates the dumping margin as part of its analysis. The operation of the model is such that a high dumping margin can control the outcome, outweighing the value contributed by other variables. The Commission found that this was the case here.
 Because the data submitted to Commerce by the Japanese producers was incomplete, the dumping margin was calculated "us[ing] an adverse inference in selecting from the facts available." Circular Seamless Stainless Steel Hollow Products From Japan, 65 Fed.Reg. at 42,986. This caused the margin to be atypically high. In its decision, the Commission explained why a high dumping margin was problematic:
 The [COMPAS] model assumes that this margin will be passed through in full to the domestic market, i.e., that the weighted average margin of 121.3 percent has resulted in a substantial decrease in the price of the subject imports in the U.S. market (by more than 50 percent). This suggests a pricing level for subject imports that is so high that they would not have been in the U.S. market at a Commerce-determined fair price. Given the historic and established role that these subject imports have played in the U.S. market, including product niches unfilled by domestic producers, we do not find this to be a reasonable conclusion, thus further limiting the usefulness of the COMPAS model in this investigation.
 Second Remand Determination, at 9 n. 24. As the Japanese producers point out, if the Commission had relied on the COMPAS model in the manner Altx suggests is appropriate, "Commerce's dumping margin decision [would] dictate the outcome of the Commission's injury decision and undermine Congress's purpose in creating separate investigations of sales at less than normal value and of injury."
 
 
 [12]
 As noted in footnote 10,supra, the Commission found that reliance on a high dumping margin would bias unfairly the results of its determination.
 
 
 [13]
 The Commission supported its inference that non-subject imports were responsible for some of the domestic industry's injury with evidence linking that injury to concurrent trends of increasing non-subject imports and decreasing subject importsSee Second Remand Determination, at 6.