# United States Court of Appeals for the Federal Circuit

2009-1476

NUCOR CORPORATION, GERDAU AMERISTEEL, INC.,
and COMMERCIAL METALS COMPANY,

Plaintiff-Appellants,

v.

UNITED STATES,

Defendant,

and

EKINCILER DEMIR VE CELIK SANAYI A.S.,
and EKINCILER DIS TICARET A.S.,

Defendants-Appellees,

and

HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S,
and KROMAN CELIK SANAYII A.S.,

Defendants,

and

COLAKOGLU DIS TICARET A.S., COLAKOGLU METALURJI A.S,
KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,
and KAPTAN METAL DIS TICARET VE NAKLIYAT A.S.,

Defendants,

and

DILER DEMIR CELIK ENDUSTRISI VE TICARET A.S.,
DILER DIS TICARET A.S.,

Defendants,

and

TAZICI DEMIR CELIK SANAYI VE TURIZM TICARET A.S.,

Defendants.

John R. Shane, Wiley Rein LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was Maureen E. Thorson.

Michael T. Shor, Arnold & Porter, LLP, of Washington, DC, argued for defendants-appellees Ekinciler Demir ve Celik Sanayi A.S., et al. With him on the brief were Lawrence A. Schneider and Francis Franze-Nakamura.

Appealed from: United States Court of International Trade

Senior Judge R. Kenton Musgrave

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-1476

NUCOR CORPORATION, GERDAU AMERISTEEL, INC.,
and COMMERCIAL METALS COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant,

and

EKINCILER DEMIR VE CELIK SANAYI A.S.,
and EKINCILER DIS TICARET A.S.,

Defendants-Appellees,

and

HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S,
and KROMAN CELIK SANAYII A.S.,

Defendants,

and

COLAKOGLU DIS TICARET A.S., COLAKOGLU METALURJI A.S,
KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,
and KAPTAN METAL DIS TICARET VE NAKLIYAT A.S.,

Defendants,

and

DILER DEMIR CELIK ENDUSTRISI VE TICARET A.S.,
DILER DIS TICARET A.S.,

Defendants,

and

TAZICI DEMIR CELIK SANAYI VE TURIZM TICARET A.S.,

Defendants.

Appeal from the United States Court of International Trade in consolidated case no. 07-00457, Senior Judge R. Kenton Musgrave.

———————————————

DECIDED: April 12, 2010

———————————————

Before BRYSON and MOORE, <u>Circuit Judges</u>, and FOLSOM, <u>Chief District Judge</u>.[*]

BRYSON, <u>Circuit Judge</u>.

This case concerns an administrative review of an antidumping order relating to imports of steel bars for concrete reinforcement ("rebar") from Turkey. The private defendants, referred to collectively as Ekinciler, are Turkish producers and exporters of rebar; the plaintiffs are domestic producers of rebar. At issue is the Commerce Department's calculation of Ekinciler's costs of production for the 2005-2006 period of review. In particular, the dispute concerns Commerce's treatment of certain items that Ekinciler characterizes as foreign exchange losses incurred in 2000-2001. The domestic producers appeal from a final decision of the Court of International Trade, <u>Nucor Corp. v. United States</u>, No. 07-457 (Ct. Int'l Trade May 22, 2009), following an earlier decision of that court remanding the matter to Commerce, <u>Nucor Corp. v. United States</u>, No. 07-457 (Ct. Int'l Trade Apr. 14, 2009). We <u>affirm</u>.

———————————————

[*] Honorable David Folsom, Chief Judge, United States District Court for the Eastern District of Texas, sitting by designation.

I

Ekinciler contends that it incurred foreign exchange losses in 2000-2001 and ultimately booked those losses in a fixed asset account designated "Melt Shop Modernization" in 2001. Although it capitalized the items in the melt shop account, Ekinciler did not subsequently depreciate the items in that account, as is typically required for fixed assets under U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS").[1]

When Commerce asked Ekinciler to explain its failure to depreciate the disputed items, Ekinciler stated that those items did not actually relate to any fixed asset, but represented losses incurred on foreign currency loans in 2000 and 2001, when a financial crisis in Turkey caused a sharp devaluation of the Turkish Lira relative to the borrowed foreign currency. Ekinciler acknowledged that, under U.S., International, and Turkish accounting principles, the foreign exchange losses should have been expensed (i.e., recorded as a loss) in the year in which they were incurred. In light of the nature of the losses, Ekinciler argued that it would be improper to impute depreciation for those items during the 2005-2006 period of review. Ekinciler explained that the items were not properly capitalizable because they were unrelated to the purchase or construction of a fixed asset, and that they should not be considered in the administrative review for

---

[1] Under GAAP and IFRS, a company may book costs in one of two ways: (1) it may capitalize the item, i.e., record it as an asset that remains on the books in subsequent periods, where there is an expected future benefit from the purchase (e.g., for plants, machinery, and equipment that will be utilized for many years); or (2) it may expense the item, i.e., record it as a loss in the period in which it was incurred, where there is no expected future benefit. If the company capitalizes the cost, it must amortize the cost over subsequent periods in order to account for the depreciation of the asset.

2005-2006 because they were not incurred during that period. In support of its position, Ekinciler submitted extensive documentation, including its complete fixed asset ledger indicating that the company added no significant fixed assets during the 2000-2001 period. It also introduced three of its foreign currency loan agreements for general company financing, as well as journal vouchers and worksheets showing the transfer of amounts relating to "foreign currency revaluation" from an expense account for "exchange gains/losses from short term bank loans" to the asset account for "Melt Shop Modernization."

In its final results for the 2005-2006 period of review, Commerce imputed depreciation for the entries in Ekinciler's melt shop account, treating those items as if they represented expenses associated with actual fixed assets. See Certain Steel Concrete Reinforcing Bars From Turkey, 72 Fed. Reg. 62,630 (Dep't of Commerce Nov. 6, 2007) (final admin. review). The imputed depreciation had the effect of raising Ekinciler's dumping margin from a de minimis level to 1.66 percent.

Commerce explained the basis for its decision in an October 31, 2007, memorandum. The memorandum began by stating that "[w]hile Ekinciler has provided copies of journal entries and loan documents . . . , there is no way to link the documents to the 'asset' listed in Ekinciler's financial statement." For that reason, Commerce stated that it was "not confident that the capitalized expenses specifically relate[d] to" foreign exchange losses on general company loans (i.e., losses unrelated to the construction or purchase of a fixed asset), as Ekinciler claimed.

Assuming that Ekinciler's characterization of the loss was accurate, Commerce explained that if Ekinciler had followed proper accounting practices under GAAP and

IFRS it "would have recognized those expenditures as an expense in the year the event took place, rather than capitalizing them and treating them as an asset in its books and records." Because Ekinciler had capitalized the items, however, Commerce reasoned that it was "unreasonable for Ekinciler to ignore the expense forever and as a result artificially inflate its balance sheet" by failing to depreciate the items over time. Therefore, because "Ekinciler opted to treat these expenses as an asset" and because "it is inherent that an asset recorded in the plant, machinery, and equipment category is related to those types of fixed assets," Commerce imputed depreciation for the items in the melt shop account and added the imputed depreciation to Ekinciler's costs of production for the 2005-2006 period of review.

Ekinciler challenged the final results in the Court of International Trade. The court disagreed with Commerce's analysis of the depreciation issue and remanded for recalculation of Ekinciler's antidumping margin. The court observed that Commerce had treated the items in the melt shop account as fixed assets but had made "no explicit finding as to what the account actually represents." Specifically, Commerce had not found that the items booked to the melt shop account actually reflected costs "associated with the production of merchandise" during the period of review, as required by 19 U.S.C. § 1677b(f)(1)(A). The court observed that Commerce's only apparent rationale for imputing depreciation to the items in the melt shop account was "concern over Ekinciler showing an 'inflated' balance sheet." Given Ekinciler's "uncontroverted" evidence as to the nature of the melt shop modernization account at the administrative review, the court concluded, "the decision to impute depreciation to the account has no basis on the administrative record or in law." The court therefore remanded the case to

Commerce with directions to redetermine imputed depreciation "without the amount that currently reflects the foreign exchange losses in the melt shop modernization account."

On remand, Commerce treated the full balance of the melt shop account as foreign exchange losses and imputed no depreciation expense to the items in that account. The elimination of that depreciation expense resulted in a de minimis dumping margin and thus no antidumping duty. The Court of International Trade affirmed the revised results, and the domestic producers now appeal to this court. Commerce has not taken a position in this appeal.

## II

In reviewing decisions of the Court of International Trade regarding Commerce's antidumping duty determinations, we apply the same standard of review as the trial court. Royal Thai Gov't v. United States, 436 F.3d 1330, 1334-35 (Fed. Cir. 2006). Therefore, we are required to uphold Commerce's findings and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## A

Under the statute governing antidumping duty determinations, Commerce's objective in calculating a foreign entity's costs of production is to ensure that its calculations "reasonably reflect the costs associated with the production and sale of the [subject] merchandise" in the period of review. 19 U.S.C. § 1677b(f)(1)(A). We agree with the trial court that Commerce failed to adduce substantial evidence showing that the disputed items reflected costs associated with fixed assets used for the production of rebar in 2005-2006, and that Commerce therefore erred when it imputed depreciation

2009-1476                    6

to those items and treated that depreciation as part of Ekinciler's costs of production for the 2005-2006 period of review.

As the trial court noted, Commerce did not find that the expenses in the melt shop account represented costs relating to plant, machinery, and equipment assets. Nor did Commerce point to anything in the evidence that would justify the conclusion that the disputed items were assets that had to be depreciated. Commerce's decision to impute depreciation appears to have been based on the items' presence in a fixed asset account, coupled with Commerce's assumption that "an asset recorded in the plant, machinery, and equipment category is related to those types of fixed assets."

Commerce's task in an administrative review is to "consider all available evidence on the proper allocation of costs" in order to verify the nature and historical treatment of the underlying costs. 19 U.S.C. § 1677b(f)(1)(A). In this case, however, Commerce attached little weight to the evidence that the disputed expenditures occurred in a period unrelated to the period of review and were recorded in an account that historically had not been depreciated. Moreover, Commerce dismissed the extensive documentation provided by Ekinciler regarding the nature of the items in the melt shop account. Commerce's only explanation for doing so was its statement that "there is no way to link the documents to the 'asset' listed in Ekinciler's financial statement." Commerce did not discuss the contents of Ekinciler's documents, however. It did not explain why those documents failed to establish the requisite "link," where any perceived gaps existed, or what additional information could have been provided to bridge those gaps. Most significantly, Commerce pointed to no contrary documents showing that the disputed entries, which are designated in the melt shop account history

simply as "Transfer[s] of Financial Expense," can be traced to the purchase or acquisition of fixed assets. Commerce thus pointed to no substantial evidentiary support for its decision to treat the items in the melt shop account as depreciable fixed assets and to disregard the extensive contrary evidence, including Ekinciler's detailed explanation of the nature of the disputed items.

Commerce's assertion that there is "no way to link" Ekinciler's documents to the claimed foreign exchange losses is belied by the documents themselves. The accounting worksheets and journal vouchers show that certain "financial expenses" were moved out of an account entitled "exchange gains/losses from short term bank loans" and that, on the same day, identical amounts were transferred to the melt shop account. Even the domestic producers concede as much. They also acknowledge generally that the melt shop account contains financial expenses related to bank loans.

The domestic producers argue that Ekinciler cannot establish a link between the foreign exchange losses recorded in the melt shop account and the loan agreements in the record, which the domestic producers concede represent general company loans unrelated to fixed assets. However, we are unaware of any method (and domestic producers suggest none) by which Ekinciler could conclusively establish that link. That is because the foreign currency loan payments were made over an extended period, beginning several years prior to the Turkish financial crisis, and the loan balances were continually changing and were subject to varying exchange rates. Thus, it was not practicable to match the loan amounts to particular entries for foreign exchange losses at any given point in time. Nevertheless, Ekinciler's journal vouchers and worksheets list each of the pertinent loans to which the foreign exchange losses were attributed,

along with the names of the lending banks and the outstanding foreign currency balances as of March 2001. Several of the loans appear to correspond to the agreements in the record, in that they were made by the same banks and carried balances consistent with the original loan amounts in the agreements of record. In light of that evidence, we do not find persuasive the suggestion by the domestic producers that Ekinciler's documents must be disregarded because they do not conclusively prove that the loan amounts in the sample loan agreements correspond precisely to the expenses listed in the melt shop account.

Ekinciler also provided Commerce with its complete fixed asset ledger, which identified every fixed asset and the year in which it was placed into service. Neither Commerce nor the domestic producers pointed to any fixed asset addition in the years 2000 or 2001 that is significant enough in value to be related to the amounts recorded in the melt shop account. In fact, nothing in the history of the melt shop account ties the listed expenses to any plant, machinery, or equipment-related fixed asset; rather, all entries are designated as financial expenses, such as "Transfer of Foreign Currency Difference" and "Transfer of Financial Expense."

In essence, Commerce concluded that Ekinciler's decision to capitalize the disputed melt shop account items in 2001 required the imputation of depreciation for 2005-2006 regardless of whether the items actually represented depreciable fixed assets. Commerce admitted that if the melt shop account items represented foreign exchange losses, they should have been expensed in the year in which they were incurred, rather than capitalized and treated as an asset. Nevertheless, Commerce concluded that because "Ekinciler opted to treat these expenses as an asset" (even if

erroneously), the items could not be "indefinitely suspended and not amortized . . . over the asset's useful life[]." That was error. Commerce was not justified in imputing depreciation merely to "correct" Ekinciler's "artificially inflated" balance sheet.

First, as the trial court noted, "Commerce's mandate does not include acting as 'the financial statements police'[;] it includes calculating only those costs that reasonably relate to cost of production during the period of review." In the absence of substantial evidence showing that the items represented costs relating to fixed assets incurred during the period of review, Commerce's imputation of depreciation was not "reasonably reflect[ive]" of Ekinciler's costs of production under section 1677b(f)(1)(A) of the antidumping statute.

Second, to the extent the presence of the capitalized (and undepreciated) items in the melt shop account may have made Ekinciler appear more solvent than it actually was, it is unclear how (and by how much) any such distortion of the balance sheet might have affected Ekinciler's 2005-2006 costs of production. Any potential effect would be both speculative and unpredictable; the putative distortion of the balance sheet might even have lowered (rather than raised) Ekinciler's costs of production, e.g., by reducing Ekinciler's borrowing costs.

Finally, it is Commerce's established policy to treat all foreign exchange losses as non-depreciable costs for the year in which they were incurred, regardless of whether the losses were incurred in connection with the production of merchandise or for any other purpose. See, e.g., Certain Frozen Warmwater Shrimp from Ecuador, 2009 WL 2986648, at cmt. 17 (Dep't of Commerce Sept. 15, 2009) (issues and decision mem.); Honey from Argentina, 2004 WL 3524390, at cmt. 6 (Dep't of Commerce May

27, 2004) (issues and decision mem.). Commerce also admitted that expensing, rather than capitalizing, foreign exchange losses is the proper way to treat such items under GAAP and IFRS. To the extent that Commerce decided to impute depreciation to the melt shop items even though they consisted largely of foreign exchange losses incurred in 2000-2001, Commerce was unjustifiably departing from its policy without explanation. Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").

B

The domestic producers argue that the trial court improperly found facts and, based on those findings, directed Commerce to reach a particular result. In doing so, the domestic producers argue, the court acted in contravention of its statutory mandate.

Under 19 U.S.C. § 1516a(c)(3), when the Court of International Trade holds that its decision is "not in harmony with" Commerce's antidumping duty determination, "the matter shall be remanded [to Commerce] for disposition consistent with the final disposition of the court." We have interpreted that statute to limit the Court of International Trade "to affirmances and remand orders; an outright reversal without a remand does not appear to be contemplated by the statute." Altx Inc. v. United States, 370 F.3d 1108, 1111 n.2 (Fed. Cir. 2004); see also Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

We do not regard the trial court as having found facts or entered an impermissible order of reversal. What the trial court held was that substantial evidence did not support Commerce's decision that Ekinciler's costs of production for the period

of review included an amount equal to the imputed depreciation on the disputed items in the melt shop account. In doing so, the court stated that Ekinciler's evidence "on the nature of the melt shop modernization account" was "uncontroverted." The domestic producers contend that, in order to reach the latter conclusion, the trial court must have independently evaluated Ekinciler's evidence and found, as a factual matter, that the disputed items consist entirely of foreign exchange losses on general company loans. That is not so.

While both Commerce and the domestic producers argued before the trial court that the melt shop items did not constitute foreign exchange losses, no evidence in the record controverted Ekinciler's documentation as to the nature and origin of the costs reflected in that account. Nor was there any evidence that the melt shop items consisted of costs incurred during the period of review in connection with the acquisition or construction of a production-related fixed asset. Commerce did not make such a finding, nor did it refer to any evidence that would support such a finding other than the fact that the account was labeled as an asset account. The domestic producers likewise failed to identify any such evidence. Moreover, as we have noted, even if Ekinciler's treatment of the melt shop items may have had some effect on Ekinciler's costs of production during the period of review, Commerce provided no basis for its assumption that the effect would systematically raise Ekinciler's costs and that it would do so in an amount equal to the depreciation that Commerce imputed to those items. Thus, given the lack of evidence that the disputed items "reasonably reflect[ed]" Ekinciler's costs of producing the relevant merchandise in the relevant period, the trial court correctly held that Commerce's decision to impute depreciation with regard to the

disputed items was unsupported by substantial evidence and therefore unsustainable as a matter of law. 19 U.S.C. § 1677b(f)(1)(A).

Having reached the conclusion that Commerce had erred in calculating Ekinciler's costs of production, the court properly remanded the matter to Commerce for a recalculation of the antidumping margin without the unsupported depreciation costs. That type of remand to Commerce "for disposition consistent with the final disposition of [the trial] court," is expressly contemplated by the statute. 19 U.S.C. § 1516a(c)(3).

It is true that, by ruling that Commerce's decision imputing depreciation to the items in the melt shop account was not legally or factually supportable, the court limited Commerce's options on remand. But that is frequently the result when a court overturns an agency's factual finding for lack of substantial evidence, particularly if the factual issue is binary in nature. Even though a reviewing court's decision that substantial evidence does not support a particular finding may have the practical effect of dictating a particular outcome, that is not the same as the court's making its own factual finding. In light of the absence of evidentiary support in the record for including the imputed depreciation for the melt shop account items in Ekinciler's costs of production, we uphold the decision of the Court of International Trade affirming Commerce's remand determination in this case.