Barnett, Judge:
This consolidated action is before the court on two motions for judgment on the agency record challenging the United States International Trade Commission's ("ITC" or "Commission") domestic like product determination in the investigation of carbon *1329 and alloy steel cut-to-length plate ("CTL plate") from Japan.[1] See Carbon and Alloy Steel Cut-to-Length Plate From Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan ("Final Japan Determination "), 82 Fed. Reg. 23,592 (ITC May 23, 2017) (final determinations), PR 529, PJA Tab 41, CJA Tab 41, ECF No. 61.
Specifically, Hitachi Metals, Ltd. and Hitachi Metals America, Inc. (together, "Hitachi") and Consolidated-Plaintiff Daido Steel Co., Ltd. ("Daido") (collectively, "Plaintiffs") challenge the ITC's inclusion of tool steel in the domestic like product as unsupported by substantial evidence and not in accordance with law. See Confidential Pls.' 56.2 Mot. for J. on the Agency R., ECF No. 45, and Confidential Mem. of Law in Supp. of Pls.' Confidential Rule 56.2 Mot. for J. Upon the Agency R. ("Hitachi Mem."), ECF No. 45-1; Confidential Consol. Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 46, and Consol. Pl.'s Confidential Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Daido Mem."), ECF No. 46-1. Defendant United States ("Defendant" or the "Government") and Defendant-Intervenors ArcelorMittal USA LLC ("ArcelorMittal") and Nucor Corp. ("Nucor") (together, "Defendant-Intervenors") support the Commission's determination. See Confidential Def. United States Int'l Trade Comm'n's Mem. in Opp'n to Pls.' and Consol. Pl.'s Mots. for J. on the Agency R. ("Gov. Resp."), ECF No. 49; Confidential Def.-Ints.' Resp. in Opp'n to Pl. Hitachi's and Consol. Pl. Daido's Respective Mots. for J. on the Agency R. ("Def.-Int. Resp."), ECF No. 48. For the reasons discussed below, Plaintiffs' motions are denied.
JURISDICTION AND STANDARD OF REVIEW
The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012), and 28 U.S.C. § 1581(c) (2012).[2] An ITC determination is "presumed to be correct," and the burden of proving otherwise rests upon the challenging party. 28 U.S.C. § 2639(a)(1). The court will uphold an ITC determination *1330 that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Huaiyin Foreign Trade Corp. (30) v. United States , 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB , 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) ). It "requires more than a mere scintilla," but "less than the weight of the evidence." Nucor Corp. v. United States , 34 CIT 70, 72, 675 F.Supp.2d 1340, 1345 (2010) (quoting Altx, Inc. v. United States , 370 F.3d 1108, 1116 (Fed. Cir. 2004) ).
BACKGROUND
I. Legal Framework
"Under the unfair trade laws, [the U.S. Department of Commerce ("Commerce") ] determines whether foreign imports into the United States are either being dumped or subsidized (or both)," and the Commission "determine[s] whether these dumped or subsidized imports are causing material injury to a domestic industry in the United States." Changzhou Trina Solar Energy Co., Ltd. v. U.S. Int'l Trade Comm'n , 39 CIT ----, ----, 100 F.Supp.3d 1314, 1319 (2015) (citation omitted); see also 19 U.S.C. §§ 1671, 1673. Accordingly, "Commerce determines the scope of [an] investigation," establishing the class or kind of foreign merchandise that would be subject to any resulting antidumping or countervailing duty order, Cleo Inc. v. United States , 30 CIT 1380, 1382 (2006), aff'd , 501 F.3d 1291 (Fed. Cir. 2007), while the Commission "identif[ies] the corresponding universe of items produced in the United States [by the affected industry] that are like, or in the absence of like, most similar in characteristics and uses with the items in the scope of the investigation," Changzhou Trina Solar , 100 F.Supp.3d at 1319 (citing 19 U.S.C. §§ 1673(i), 1671(a) ) (additional citation and quotation and formatting marks omitted); see also 19 U.S.C. § 1677(10) ("The term 'domestic like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."). Although the scope of an investigation "is necessarily the starting point of the Commission's like product analysis," Cleo Inc. v. United States , 501 F.3d 1291, 1298 n.1 (Fed. Cir. 2007) (citing 19 U.S.C. § 1677(10) ), the scope "does not control the Commission's determination," id. ; see also Hosiden Corp. v. Advanced Display Mfrs. of Am. , 85 F.3d 1561, 1567 (Fed. Cir. 1996) (citation omitted).
The domestic like product determination is a fact-specific inquiry pursuant to which the Commission weighs "six factors relating to the products in question: (1) physical characteristics and uses; (2) common manufacturing facilities and production employees; (3) interchangeability; (4) customer perceptions; (5) channels of distribution; and, where appropriate, (6) price." Cleo , 501 F.3d at 1295. "When weighing those factors, the Commission disregards minor differences and focuses on whether there are any clear dividing lines between the products being examined." Id.
II. Factual and Procedural History
On April 8, 2016, domestic CTL[3] plate producers ArcelorMittal, Nucor, and SSAB Enterprises, Inc. (collectively, the "Petitioners") filed an antidumping and countervailing duty petition with Commerce and the ITC regarding certain carbon and alloy *1331 steel CTL plate imported from several countries. Antidumping and Countervailing Duty Petition, Vol. 1, General and Injury Sections (Apr. 8, 2016) ("Petition"), PR 1, CR 1, PJA Tab 1, CJA Tab 1, ECF No. 61. Therein, the Petitioners framed the scope of the investigation as "certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate)." Id. at 9. The Petitioners proposed various requirements regarding width and thickness, permissible amounts of iron and carbon content, and third country processing. Id. at 10. The Petitioners further proposed excluding seven categories of products from the scope, including stainless steel, and set forth additional exclusions on the basis of existing antidumping or countervailing duty orders involving the People's Republic of China and South Korea. Id. at 10-15. According to the Petitioners, by including "all alloy CTL plate other than stainless plate," the proposed scope was broader than in past investigations, but such broadening was necessary to "reflect[ ] changes in steelmaking and the types of CTL plate being produced by the domestic CTL plate industry." Id. at 16. The Petitioners urged the ITC to find a single domestic like product coextensive with the scope of the investigation. Id. at 22-24.
The Commission subsequently instituted an antidumping and countervailing duty injury investigation into certain carbon and alloy steel cut-to-length plate from Austria, Belgium, Brazil, China, France, Germany, Italy, Japan, Korea, South Africa, Taiwan, and Turkey. Notice of Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Prelim. Phase Investigation (Apr. 8, 2016), PR 17, PJA Tab 2, CJA Tab 2, ECF No. 61. In May 2016, the Commission made a preliminarily affirmative injury finding regarding imports of certain carbon and alloy steel cut-to-length plate from several countries, including Japan, which were alleged to be sold in the United States at less than fair value. See Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, China, France, Germany, Italy, Japan, Korea, South Africa, Taiwan, and Turkey , Inv. Nos. 701-TA-559 -561 and 73-TA-1317-1328, USITC Pub. 4615 (May 2016) (Prelim.) at 1, PR 159, PJA Tab 5, CJA Tab 5, ECF No. 61. The Commission preliminarily found "a single domestic like product consisting of all CTL plate coextensive with the scope of these investigations" as announced by Commerce in its notices of initiation. Id. at 14. The scope included:
Certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances. Subject merchandise includes plate that is produced by being cut-to-length from coils and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, i.e., products which have been "worked after rolling," (e.g. , products which have been beveled or rounded at the edges).
*1332 Id. at 6-7. The scope also adopted Petitioners' proposals regarding width and thickness measurements, iron and carbon content, third country processing, seven categories of excluded products, and exclusions on the basis of existing antidumping and countervailing duty orders. See id. at 7-11 & n.26 (citations omitted); cf. Petition at 9-15.
Following the preliminary determination, the Commission invited interested parties to comment on draft questionnaires to be issued to producers, importers, and purchasers for the final investigation. See U.S. Producer; Importer; Purchaser; and Foreign Producer Draft Questionnaires, PR 180, PJA Tab 6, CJA Tab 6, ECF No. 61. Hitachi, Daido, and other interested tool steel producers (collectively the "Tool Steel Respondents") recommended revisions to the questionnaires for the purpose of obtaining tool steel-specific information relevant to the Commission's domestic like product determination. Hitachi Metals' Draft Questionnaire Comments (Sept. 13, 2016) ("Hitachi QRE Cmts") at 3-7, PR 187, PJA Tab 8, CJA Tab 8, ECF No. 61, Suppl. CJA Tab 8, ECF No. 65-2; Comments on the Draft Producer, Importer, Purchaser, and Foreign Producer Final-phase Questionnaires (Deutsche Edelstahlwerke GmbH ("DEW") ) (Sept. 13, 2016) ("DEW QRE Cmts") at 1-3, PR 189, PJA Tab 9, CJA Tab 9, ECF No. 61; Comments on Draft Questionnaires (Voestalpine) (Sept. 13, 2016) ("Voestalpine QRE Cmts") at 5, PR 191, PJA Tab 10, CJA Tab 10, ECF No. 61. Hitachi asserted that those revisions were "needed for the Commission to fully examine the domestic like product issues, domestic industry issues, or separate injury analyses implicated by tool steel or forged tool steel." Hitachi QRE Cmts at 3. Hitachi also requested the Commission to issue producer questionnaires to U.S. tool steel producers. Hitachi Metals' Request to Issue U.S. Producer Questionnaires to U.S. Tool Steel Producers (Oct. 14, 2016) ("Hitachi QRE Request"), PR 207, PJA Tab 12, Suppl. CJA Tab 12, ECF No. 65-1.
The Commission initially declined to seek additional tool steel-specific data on the basis that the Tool Steel Respondents "had not presented sufficient information-in terms of the six factors that the Commission generally considers-to warrant collecting this additional information." Prehearing Report (Nov. 15, 2016) ("Prehearing Staff Report") at I-49, PR 270, PJA Tab 14, CR 836, CJA Tab 14, ECF No 61. However, the Commission ultimately issued questionnaires to at least some of the U.S. tool steel producers identified in Hitachi's request, compare Hitachi QRE Request, Attach. 1 (listing producers), with Staff Report I at III-2 n.3 (stating which of those producers failed to respond),[4] as well as supplemental questionnaires to four[5] additional U.S. tool steel producers, Staff Report I at III-3 n.3. The Commission also obtained information from two[6] U.S. tool steel producers via e-mail and telephone. Staff Report I at III-2 n.3; Views I at 19 n.42, 20 n.47.
On January 26, 2017, the Commission published its final affirmative determination regarding carbon and alloy steel cut-to-length plate from Brazil, South Africa, and Turkey. Carbon and Alloy Steel Cut-to-Length Plate From Brazil, South Africa, and Turkey , 82 Fed. Reg. 8,541 (ITC Jan. 26, 2017), PR 456, PJA Tab 36, CJA
*1333 Tab 36, ECF No. 61-1.[7] The Commission confirmed its preliminary finding of "a single domestic like product, consisting of all CTL plate, that is coextensive with the scope of the investigations." Views I at 16. After comparing tool steel to other carbon and alloy steel CTL plate products pursuant to its six-factor test, the Commission rejected the Tool Steel Respondents' argument that tool steel constituted a separate like product. See id. at 17-24. The Commission explained that when, as here, the
domestically manufactured merchandise is made up of a grouping of similar products or involves niche products, the Commission does not consider each item of merchandise to be a separate like product that is only "like" its identical counterpart in the scope, but considers the grouping itself to constitute the domestic like product and "disregards minor variations," absent a "clear dividing line" between particular products in the group.
Id. at 22-23 (footnote citations omitted). The Commission did not reach an explicit finding with regard to whether each factor favored a particular determination; rather, the Commission concluded that although the evidence as a whole was "mixed," "the acknowledged differences between tool steel and high speed steel [8 ] and other types of CTL plate" did not support finding a clear dividing line between tool steel and other CTL plate products. Id. at 22-23.
On June 6, 2017, Hitachi initiated this action challenging the Commission's domestic like product determination. Summons, ECF No. 1. On June 23, 2017, Daido initiated a separate action likewise challenging the Commission's domestic like product determination. See Summons, ECF No. 1, Court No. 17-00165. On September 1, 2017, the court consolidated the two actions under lead court no. 17-00140. Order (Sept. 1, 2017), ECF No. 36. Hitachi's and Daido's respective Rule 56.2 motions are fully briefed, and the court heard oral argument on September 6, 2018. See Docket Entry, ECF No. 66.
DISCUSSION
I. Whether the Commission's Determination is in Accordance with Law
A. Parties' Contentions
Plaintiffs contend that the Commission's domestic like product determination is contrary to law because it departs from 35 years of agency practice treating tool steel as distinct from other types of carbon and alloy steel, and the Commission failed to provide a reasoned explanation for its departure from that practice. Hitachi Mem. at 9-20; Confidential Pls.' Reply to Def.'s Mem. in Opp'n to Pls.' Mots. for J. on the Agency R. ("Hitachi Reply") at 9, ECF No. 53; Daido Mem. at 24-33; Consol. Pl.'s Reply Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Daido Reply") at 5-10, ECF No. 54.[9] Plaintiffs further contend *1334 that the Commission acted arbitrarily by including tool steel within the domestic like product while excluding stainless steel, to which tool steel is similar, irrespective of stainless steel's exclusion from the scope of the investigation. Hitachi Mem. at 21-22; Hitachi Reply at 10-12; Daido Mem. at 35-38. Daido contends that the Commission's failure to address the Tool Steel Respondents' arguments in this regard requires a remand. Daido Mem. at 38; Daido Reply at 10-11.
Defendant and Defendant-Intervenors contend that Plaintiffs have not established that the Commission had a practice of treating tool steel as a separate like product distinct from other carbon and alloy CTL plate. Gov. Resp. at 31-36; Def.-Int. Resp. at 13-24. Defendant further contends that the Commission did not affirmatively exclude from the domestic like product the categories of alloy steel products that were not in scope; rather, it had no occasion to address those products because none of the interested parties argued for their inclusion or exclusion. Gov. Resp. at 37.
B. Plaintiffs Have Not Demonstrated the Existence of an Agency Practice Vis-à-Vis Tool Steel
Generally, ITC determinations are sui generis , i.e., "necessarily confined to a specific period of investigation with its attendant, peculiar set of circumstances." Nucor Corp. v. United States , 28 CIT 188, 233, 318 F.Supp.2d 1207, 1247 (2004) (citation omitted). Those circumstances include the "particular record at issue [and] the arguments raised by the parties." Citrosuco Paulista, S.A. v. United States , 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988) (citation and emphasis omitted).
Nevertheless, when the Commission has "a uniform and established procedure [ ] that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established ... procedure," that procedure rises to the level of "agency practice." Ranchers-Cattlemen Action Legal Found. v. United States , 23 CIT 861, 884-85, 74 F.Supp.2d 1353, 1374 (1999). When the Commission has an agency practice, it must conform its determinations to that practice or explain its reasons for departing therefrom. See Citrosuco Paulista , 12 CIT at 1209, 704 F.Supp. at 1088. In the absence of an agency practice, the Commission is not required to explain discrepancies between its findings in a particular determination and past determinations. See Nucor , 28 CIT at 233, 318 F.Supp.2d at 1247.
In the underlying administrative proceeding, the Commission rejected the Tool Steel Respondents' argument that it "had an established practice of treating tool steel as a separate domestic like product." Views I at 23. The Commission reasoned that the Tool Steel Respondents had failed to "identif[y] any prior antidumping or countervailing duty investigation in which the scope included carbon and alloy steel (including tool steel) and the Commission decided that tool steel was a separate like product." Id. at 23-24.
Plaintiffs again cite to several steel safeguard investigations and antidumping and countervailing duty ("AD/CVD") investigations and sunset reviews to support their arguments regarding the existence of an agency practice. See Hitachi Mem. at 13-17 & Attach. 1;[10] Daido Mem. at 25-31. As *1335 noted above, however, the Commission's domestic like product analysis begins with Commerce's description of the scope of the subject merchandise. See Cleo , 501 F.3d at 1298 n.1. And as discussed more fully below, the starting point for the Commission's like product analysis in the determinations relied upon by Plaintiffs differed from the scope that formed the starting point for the Commission's determination at issue here. For those reasons, the cited determinations lack precedential value and otherwise fail to establish an agency practice regarding tool steel. See Citrosuco Paulista , 12 CIT at 1209, 704 F.Supp. at 1088 (ITC determinations are generally confined to specific records and arguments).
Safeguard Investigations
Plaintiffs cite to three safeguard investigations as ostensibly supporting the treatment of tool steel as a separate like product. Hitachi Mem. at 13-15 (citing Steel , Inv. No. TA-201-73, USITC Pub. 3479 (Dec. 2001) ("2001 Steel 201 "); Stainless Steel and Alloy Tool Steel , Inv. No. TA-201-48, USITC Pub. 1377 (May 1983) ("1983 Stainless and Alloy Tool Steels 201 "); Stainless Steel and Alloy Tool Steel , Inv. No. TA-201-5, USITC Pub. 756 (Jan. 1976) ("1976 Stainless and Alloy Tool Steels 201 ") ); Daido Mem. at 25-27 (citing same). Safeguard investigations, however, arise under a different statutory scheme[11] and serve different purposes.[12] Thus, Section 201 like product determinations are "of limited usefulness" in Title VII (antidumping and countervailing duty) domestic like product determinations. Cut-to-Length Plate from China, Russia, South Africa, and Ukraine , Inv. Nos. 731-TA-753 -756, USITC Pub. 3626 (Sept. 2003) (Review) at 7 n.20 (rejecting a party's reliance on the 2001 Steel 201 investigation to support its proposed domestic like product determination in a Title VII investigation). Nevertheless, to the extent the safeguard investigations could be considered as informing the Commission's practice with regard to tool steel, the cited determinations fail to support Plaintiffs' position.
In 2001, the Commission investigated increased imports of four categories of steel products: "(1) certain carbon and alloy flat products, (2) certain carbon and alloy long products, (3) certain carbon and alloy pipe and tube products, and (4) certain stainless steel and alloy tool steel products." 2001 Steel 201 at 31-32. The Commission subsequently made domestic *1336 industry determinations on the basis of like product determinations within each category; thus, the Commission considered tool steel solely in relation to stainless steel. Id. at 190, 200. The Commission found the existence of ten domestic industries producing products like or corresponding to the stainless steel and tool steel category, with one industry specific to tool steel. Id. at 190. In so doing, the Commission rejected one party's argument that it should find a single like product and one domestic industry producing stainless and tool steel products. Id. at 192. The Commission found several differences between tool steel and stainless steel with regard to production, physical characteristics, end uses, and channels of distribution. Id. at 200.
Plaintiffs assert that the Commission's grouping of tool steel with stainless steel in the 2001 safeguard investigation suggests that it considers tool steel to be more like stainless steel than other steel products. Hitachi Mem. at 15; Daido Mem. at 27. Plaintiffs further assert that the Commission concluded therein that "tool steel was a separate like product from all other carbon, alloy, and stainless steel flat products." Hitachi Mem. at 15; see also Daido Mem. 27.
Contrary to Plaintiffs' assertions, the four categories of investigated steel products were defined by the U.S. Trade Representative and the U.S. Senate Committee on Finance, each of which sent a request to the Commission to institute its investigation. 2001 Steel 201 at 28, 31. Although the Commission characterized the groupings as a "useful starting point" in its like product analysis, it noted that it "is not bound in any way by [those] groupings." Id. at 32. Moreover, the Commission did not make findings with regard to tool steel's likeness to all other steel products; instead, the Commission considered tool steel solely in relation to stainless steel, and noted differences between those products sufficient to consider them to be distinct like products. Id. at 190, 200.
In 1976 and 1983, the Commission addressed increased imports of stainless steel and alloy tool steel. See 1976 Stainless and Alloy Tool Steels at 3; 1983 Stainless and Alloy Tool Steels 201 at 4. In the 1976 safeguard investigation, three Commissioners concluded that tool steel was part of the same domestic industry as stainless steel. 1976 Stainless and Alloy Tool Steels at 8 (Views of Commissioners George Moore and Catherine Bedell), 50-51 (Views of Commissioner Italo H. Ablondi). In contrast, two Commissioners concluded that tool steel and stainless steel were produced by distinct domestic industries. Id. at 17 (Views of Chairman Will E. Leonard), 37 (Views of Vice Chairman Daniel Minchew). In 1983, the Commission unanimously found that tool steel and stainless steel constituted distinct industries. 1983 Stainless and Alloy Tool Steels 201 at 13-14.
Plaintiffs seek to rely on these earlier determinations. They point to the 1983 findings to buttress their assertion that tool steel should have been considered a separate like product in the underlying proceeding, and to the 1976 findings to buttress their assertions that tool steel should not have been included in the domestic like product when stainless steel was not so included. See Hitachi Mem. at 13-14 (citing 1976 Stainless and Alloy Tool Steels 201 at A-3; 1983 Stainless and Alloy Tool Steels 201 at 13-14); Daido Mem. at 25-26 (citing 1976 Stainless and Alloy Tool Steels 201 at 8, 17, 37, 50-51; 1983 Stainless and Alloy Tool Steels 201 at 13).[13]
*1337 However, the differing conclusions reached by the Commission regarding tool steel and stainless steel in the section 201 investigations demonstrate the sui generis nature of like product determinations and the high bar Plaintiffs must surmount to prove the existence of an agency practice. See Nucor , 28 CIT at 233, 318 F.Supp.2d at 1247. Additionally, the Commission's Section 201 determinations regarding tool steel's comparability to stainless steel cannot reasonably be considered a practice binding upon the Commission in a subsequent Title VII determination concerning tool steel's comparability to the broader category of carbon and alloy steel CTL plate products at issue here. See Apex Frozen Foods Private Ltd. v. United States , 38 CIT ----, ----, 37 F.Supp.3d 1286, 1301 (2014) ("Agency actions become binding when practice produces reasonable reliance.") (citing Ranchers-Cattlemen , 23 CIT at 884-85, 74 F.Supp.2d at 1374 ).
Antidumping and Countervailing Duty Investigations and Sunset Reviews
Plaintiffs' reliance on certain AD/CVD investigations likewise fails for the reason that the inquiry confronting the Commission in the cited investigations differed from the inquiry that confronted the Commission in the underlying investigation. Plaintiffs point to the Commission's determination in Certain Tool Steels from Brazil and the Federal Republic of Germany , Inv. No. 701-TA0187, USITC Pub. 1403 (July 1983) (Final) ("Tool Steel from Brazil and Germany "). Hitachi Mem. at 14 (citing Tool Steel from Brazil and Germany at 6); Daido Mem. at 27-28 (citing Tool Steel from Brazil and Germany at 6, 8). Hitachi asserts that, in that investigation, the Commission found tool steel to be distinct from carbon steel. Hitachi Mem. at 14. The scope of that investigation, however, and, thus, the starting point for the Commission's inquiry, was limited to alloy tool steel bar and rod. Tool Steel from Brazil and Germany at 6. The Commission referred to differences between tool steel and carbon steel with regard to metallurgy and performance characteristics as part of its discussion about the nature of the domestic industry producing tool steel, but it was not addressing, nor was it called upon to address, whether to include carbon steel as part of the domestic like product. See id. at 6. The only question confronting the Commission was whether to separate tool steel into several categories of separate like products, which it declined to do. Id. at 7-8.
Plaintiffs point to additional AD/CVD investigations involving some combination of carbon, micro-alloy, and alloy steels. Hitachi Mem. at 15-17 & Attach. 1 (citations omitted); Daido Mem. at 28-30 (citations omitted). As Daido acknowledges, however, the scope of each investigation, and, thus, the Commission's starting point, either (1) was limited to carbon or carbon-quality steel products, or (2) specifically excluded tool steel. See Daido Mem. at 28-30. The court's review of those investigations finds no case in which the Commission *1338 was requested to include tool steel in the domestic like product.[14] As noted above, the Commission makes its domestic like product determinations in relation to the particular scope as described by Commerce and on the basis of the relevant record and arguments. See Cleo , 501 F.3d at 1298 n.1 ; Citrosuco Paulista , 12 CIT at 1209, 704 F.Supp. at 1088. Because the scope description, record evidence, and arguments differed in the cited determinations, the Commission made no explicit findings therein suggesting an agency practice regarding tool steel upon which Plaintiffs could reasonably rely. See Apex Frozen Foods , 37 F.Supp.3d at 1301.
Hitachi also points to the Commission's domestic like product determination in a recent sunset review of AD/CVD orders on carbon-quality steel plate. See Hitachi Reply at 6. Hitachi asserts that "the Commission found clear dividing lines" in the sunset review "between other alloy steel plate, which would include tool steel, and non-alloy tool steel." Id. (citing Cut-to-Length Carbon-Quality Steel Plate From India, Indonesia, and Korea , Inv. Nos. 701-TA-388, 389, and 391 and 731-TA-817, 818, and 821, USITC Pub. 4764 (Feb. 2018) (Third Review) ("Carbon-Quality Steel Plate ") at 8 n.18). According to Hitachi, the sunset review reflects the Commission's reversion "to excluding tool steel from the like product, consistent with its normal practice." Hitachi Mem. at 17. Hitachi has misconstrued the Commission's determination.
The passage cited by Hitachi contains the Commission's summary of its domestic *1339 like product determination in the preliminary phase of the original 1999 investigation. See Carbon-Quality Steel Plate at 8 n.18 (citing Certain Cut-to-Length Carbon Steel Plate from the Czech Republic, France, India, Indonesia, Italy, Japan, Korea and Macedonia , Inv. Nos. 701-TA-387-392 and 731-TA-815-822, USITC Pub. 3181 (Apr. 1999) (Prelim.) ("Carbon Steel Prelim. ") at 6-7). The scope of that investigation consisted, inter alia , of "certain hot-rolled carbon-quality steel," which, in turn, included "universal mill plates ... of iron or non-alloy-quality steel" and "flat-rolled products, hot-rolled, ... and which are cut-to-length." Carbon Steel Prelim. at 4. The scope specifically excluded tool steel. Id. at 5. Although the Harmonized Tariff Schedule of the United States distinguishes non-alloy steel plate from other alloy steel plate, the domestic producers urged the Commission to include micro-alloy steel plate in the domestic like product. Id. at 5-6. The Commission subsequently did so on the basis of micro-alloy steel plate's greater similarity to non-alloy steels than to alloy steel. Id. at 7. The Commission noted that "the differences between micro[-]alloy steels and non-alloy cut-to-length steel plate are not so pronounced as to constitute clear dividing lines, but that other alloy steel plate exhibits marked differences from both non-alloy and micro[-]alloy CTL plate."Id. The Commission ultimately found a single domestic like product consisting of non-alloy steel plate and micro-alloy steel plate. Id.
The arguments and evidence confronting the Commission in Carbon Steel Prelim. related to whether the Commission should include a subset of alloy steels, i.e., micro-alloy steel plate, in the domestic product that is like the carbon-quality steel plate at issue in the investigation. See id. at 6-7. Although the Commission noted differences between micro-alloy steel plate/non-alloy steel plate and other alloy steel plate, the Commission did not address, in terms of its six-factor test, whether to include alloy steel plate in toto in the domestic like product. See id. In the sunset review cited by Hitachi, the Commission pointed to the absence of new information meriting revision of its domestic like product determination and the lack of requests from interested parties seeking review thereof. Carbon-Quality Steel Plate at 8. The Commission did not, as Hitachi asserts, recently find "clear dividing lines" between alloy steel plate and non-alloy CTL plate, and its original domestic like product determination made in the context of the narrower scope of that investigation is not inconsistent with the instant determination reached on the basis of the current record.
In sum, the scope of the instant investigation was broader than past AD/CVD investigations by reason of the inclusion of all alloy CTL plate (including tool steel, but excluding stainless steel). See Petition at 16. Accordingly, this appears to be the first time interested parties have presented the Commission with specific arguments and evidence regarding tool steel's inclusion in the domestic like product (or exclusion therefrom) in that context. The Commission's previous like product determinations made in connection with different scope descriptions and on the basis of different arguments and evidence did not compel the Commission to exclude tool steel from the domestic like product in this case. Accordingly, Plaintiffs' appeal to agency practice is unavailing.
C. The Commission's Determination Was Not Arbitrary or Unreasonable
In the underlying proceeding, the Tool Steel Respondents urged the Commission to treat tool steel as a separate like product because it is more similar to the CTL plate products excluded from the scope than it is to the products in scope. Tool Steel Respondents' Post-Hr'g Br.
*1340 (Dec. 8, 2016) at 3, Ex. 1 at 6, PR 349, CR 877, PJA Tab 18, CJA Tab 18, ECF No. 61. The Commission did not explicitly address this argument, see generally Views I ; however, the "law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned by a reviewing court," Timken U.S. Corp. v. United States , 421 F.3d 1350, 1354 (Fed. Cir. 2005) (quoting Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. I at 892 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4215) (internal quotation marks and citations omitted); see also Bowman Transp. v. Ark.-Best Freight Sys. , 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (articulating the discernible path standard).
The material issue in the Commission's domestic like product determination concerned tool steel's likeness or similarity to the carbon and alloy CTL plate products within the scope of the investigation. See Changzhou Trina Solar , 100 F.Supp.3d at 1319. The Commission discussed this issue in detail; thus, this is not a case where the Commission has "entirely failed to consider an important aspect of the problem." See Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (agency action is arbitrary when it "entirely fail[s] to consider an important aspect of the problem"). Tool steel's relative likeness to products that were excluded from the scope is immaterial because any such likeness does not preclude a finding that tool steel is also like the products in the scope. Thus, the Commission's failure to explicitly respond to this argument does not require a remand.[15] The Commission's determination was not arbitrary and is otherwise in accordance with law.
II. Whether the Commission's Determination is Supported by Substantial Evidence
A. Parties' Contentions
Plaintiffs contend the Commission's domestic like product determination is unsupported by substantial evidence because the Commission failed to adequately collect and investigate data regarding tool steel. Hitachi Mem. at 22-25; Daido Mem. at 33-35. Plaintiffs further contend that the conclusions the Commission drew on the basis of its six-factor analysis are contrary to the record evidence. Hitachi Mem. at 25-42; Daido Mem. at 11-24. Defendant *1341 and Defendant-Intervenors contend that the Commission properly collected and considered all relevant evidence in accordance with its six factor test, and its conclusions are supported by substantial evidence. Gov. Resp. at 9-31; Def.-Int. Resp. at 24-43.
B. The Commission Adequately Investigated the Material Issues
According to Commission regulations, "[t]he Director shall circulate draft questionnaires for the final phase of an investigation to parties to the investigation for comment.... All requests for collecting new information shall be presented at this time." 19 C.F.R. § 207.20(b). When parties seek additional information regarding a proposed "like product breakout that is different from the way in which the like product was defined in the Commission's preliminary determination," they must make a "reasonable showing" under the six-factor test to warrant the collection. Gov. Resp. at 10; see also Prehr'g Report at I-49 (denying the Tool Steel Respondents' request to collect additional tool steel-specific information because they failed to show that its collection was merited pursuant to the Commission's six-factor test). Plaintiffs challenge the Commission's initial denial of the Tool Steel Respondents' request for the collection of tool steel-specific information as unsupported by substantial evidence, arbitrary, and unlawful. Hitachi Mem. at 23-25; Daido Mem. at 33-34; Hitachi Reply at 12-17. Plaintiffs' challenge lacks merit.
In the underlying proceeding, as noted above, Hitachi, DEW, and Voestalpine submitted requests for the collection of additional information about tool steel. Hitachi QRE Cmts at 3; DEW QRE Cmts at 1-3; Voestalpine QRE Cmts at 5. According to Hitachi, it submitted "over 300 pages of information regarding the Commission's six like product factors" in support of its request. Hitachi Reply at 14; see also Hitachi Mem. at 24. That information, however, constituted Hitachi's and five other companies' submission to Commerce regarding the exclusion of tool steel from the scope of the investigations. See Hitachi QRE Cmts at 3 (asserting that the submission nevertheless "contained substantial information related to the Commission's like product factors"); see also id. , Attach. 1 (excerpt of scope comments). Although the standards applicable to scope rulings and domestic like product determinations may seem similar, they are quite distinct.[16] Commerce's scope rulings assess factors in relation to the foreign like product and subject merchandise produced in the country(ies) subject to investigation, whereas the ITC's domestic like product determinations assess factors in relation to the production and sale of domestic like product by the domestic industry. Hitachi's scope-related comments, therefore, were not directly relevant to the Commission's domestic like product determination.[17]
*1342 Hitachi and DEW also urged the ITC to collect additional information by asserting that "U.S. producers ... do not produce and do not have the capacity to produce most types of tool steel." Hitachi QRE Cmts at 1 (emphasis added); see also DEW QRE Cmts at 2. Their assertion however, may be viewed as an admission that at least some types of tool steel are domestically produced. Moreover, the lack of domestic production of identical merchandise is not a basis for recognizing a separate domestic like product. 19 U.S.C. § 1677(10) (defining domestic like product as a product "like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation").
Hitachi and Voestalpine pointed to the Commission's treatment of tool steel in prior determinations, including the 2001 steel safeguard investigation. Hitachi QRE Cmts at 2; Voestalpine QRE Cmts at 2 & nn.1-2 (citations omitted). DEW pointed to the exclusion of tool steel from the scope of prior CTL plate investigations by Commerce as evidence that it "is not part of the like product." DEW QRE Cmts at 2 & n.8 (citation omitted). As discussed supra , however, the comparison of tool steel with stainless steel in the 2001 steel safeguard investigation is not determinative of the relationship between tool steel and carbon and alloy steel in these investigations. Further, the exclusion of tool steel from the scope of prior investigations is inapposite to whether the Commission must include it in the domestic like product when it is included in the scope of the investigation.
Nevertheless, as Plaintiffs acknowledge, the Commission ultimately issued questionnaires and supplemental questionnaires to U.S. tool steel producers. Hitachi Mem. at 24; Daido Mem. at 34; see also Staff Report I at III-2-III-3 & n.3. The Commission also obtained additional information from two producers that did not respond to the questionnaire-including one of the largest U.S. tool steel producers. Staff Report I at III-2 n.3; Views I at 19 n.42.
Hitachi emphasizes the failure of some of U.S. tool steel producers to respond to the Commission's questionnaire, Hitachi Mem. at 24, and asserts the Commission's statement that it had "limited information" regarding the applicability of "several of the six factors" to tool steel was an "admission" that it "lacked complete information" to undertake the analysis, id. at 25. Plaintiffs contend the court should remand the Commission's determination with instructions to re-open the record to collect additional information. Id. at 25; Daido Mem. at 35.[18]
Plaintiffs' criticism of the determination on the basis of the failure of some tool steel producers to respond to the Commission's questionnaire is inapposite. As discussed herein, the determination is supported by substantial evidence. Not only did the Commission utilize the data it did receive from domestic tool steel manufacturers, it also sought out non-responding *1343 manufacturers, obtaining information and data from them to incorporate into its analysis. Staff Report I at III-2 n.3; Views I at 19 n. 42; see also infra , note 22.[19]
Hitachi is also wrong to assert that the Commission conceded that it had limited information regarding "several of the six factors." Hitachi Mem. at 25. The Commission noted that there was "limited information in the record on channels of distribution" only. Views I at 22 (summarizing the Commission's findings). Plaintiffs appear to assert there was substantial record evidence for the finding that tool steel constituted a separate like product, but not the contrary finding that tool steel is part of a single domestic like product. See Hitachi Mem. at 25 ("Notwithstanding the Commission's failure to collect all relevant information, ... the record of this proceeding nevertheless still demonstrates that tool steel is a separate like product."); Daido Mem. at 35 ("The limited record, if anything, supports a finding that tool steel is a separate like product."). Plaintiffs' assertions reflect disagreement with the conclusion the Commission drew from the available evidence, but that is not a proper basis for a remand. Downhole Pipe & Equip., L.P. v. United States , 776 F.3d 1369, 1377 (Fed. Cir. 2015) (the court is not to reweigh the evidence). As discussed infra , the Commission's domestic like product determination is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. , 305 U.S. at 229, 59 S.Ct. 206, even if substantial evidence may also support the contrary conclusion, see Matsushita Elec. Indus. Co. v. United States , 750 F.2d 927, 933 (Fed. Cir. 1984).[20]
C. The Commission's Determination is Supported by Substantial Evidence
Plaintiffs challenge the Commission's analysis of the six factors and the conclusions it reached on the basis of that analysis. Hitachi Mem. at 25-42; Daido Mem. at 11-24. As discussed below, the Commission's findings are supported by substantial evidence. Plaintiffs' challenges rest primarily on disagreements with the Commission's view of the record evidence. Each of the six factors is discussed, in turn.
Physical Characteristics and Uses
Plaintiffs assert that differences in tool steel's chemical composition and metallurgy-in *1344 particular, its higher alloy content-support finding a clear dividing line between tool steel and other CTL plate products. Hitachi Mem. at 27-28; Daido Mem. at 13-14.[21] Plaintiffs further point to tool steel's different mechanical properties to support their view.[22] Hitachi Mem. at 28-30; Daido Mem. at 15.
The Commission acknowledged the different mechanical properties in tool steel as compared to other CTL plate. Views I at 18.[23] The Commission noted, however, that "[t]ool steel and high speed steel share basic physical characteristics in terms of chemical composition and dimensions with other CTL plate products." Id. at 17 & n.32 (citing Staff Report I at I-36; Petition at 24). Although tool steel "generally [has] higher levels of alloys than other CTL plate," high alloy content "is not a unique feature." Id. The Commission pointed to evidence that some "CTL plate products [also] have relatively high levels of alloy[,] and there is at least one type of tool steel with a relatively low alloy level." Id. at 17-18 & n.35 (citing ArcelorMittal USA LLC Posthearing Br. (Dec. 8, 2016) ("AMUSA Post-Hr'g Br."), Ex. 1 at 9, PR 351, PJA Tab 19, CR 869, CJA Tab 19, ECF No. 61) ).[24]
Plaintiffs also assert that tool steel and other CTL plate products have different end uses. Hitachi Mem. at 30-31; Daido Mem. at 15-16. For example, "[t]ool steel is extremely hard and is used for cutting, pressing, extruding, and coining of metals and other materials; forming tools ...; and the stamping of surfaces of machinery," specific purposes for which other types of CTL plate products cannot be used. Hitachi Mem. at 30. Other CTL plate products are used in load bearing and structural applications, among others, which do not require the specialized mechanical properties of tool steel, which is also more expensive. Hitachi Mem. at 31; Daido Mem. at 15.
The Commission concluded that specificity of end use is not unique to tool steel because "other CTL plate products are also designed for specific end uses and customer requirements." Views I at 18 & n.37 (citing Staff Report I at Table I-6, II-1).
*1345 The Commission's staff report listed several applications in which "commodity-grade CTL plate" is used, "such as the manufacture of storage tanks, heavy machinery and machinery parts, ships and barges, agriculture and construction equipment, and general load-bearing structures." Staff Report I at II-1. While tool steel and non-tool steel CTL plate products are used for different purposes, as the Commission noted, specificity of end use may not carry much weight when, as here, the domestic like product "is made up of a grouping of similar products or involves niche products," Views I at 22, which serve a variety of purposes, see Staff Report I at I-36 - I-37, II-1 (citations omitted).
Hitachi further asserts the Commission's findings in this proceeding contradict its recognition of tool steel's unique chemical composition in prior safeguard investigations. Hitachi Mem. at 27 (citing 2001 Steel 201 at 200; 1983 Stainless and Alloy Tool Steels 201 at 10). The Commission has acknowledged certain metallurgical differences between tool steel and carbon or stainless steels. See 2001 Steel 201 at 200; 1983 Stainless and Alloy Tool Steels 201 at 10. However, the record of this proceeding reflected shared characteristics in terms of carbon content and some overlapping alloy content with regard to the broader category of carbon and alloy CTL plate products at issue. See Views I at 17-18 & nn.32, 35 (citations omitted). The Commission also noted that reliance on its comparisons in prior safeguard cases lacks merit because "the Commission was not comparing tool steel to other types of carbon and alloy steel, as it is here." Views I at 18 & n.35.
In sum, the Commission's findings as to this factor are supported by substantial evidence.
Manufacturing Facilities and Production Employees
Plaintiffs contend the record evidence demonstrates "a clear divide between those entities producing and selling tool steel and those producing other types of CTL plate." Hitachi Mem. at 32; see also Daido Mem. at 17-18 ("The largest U.S. producers of tool steel do not make non-tool steel CTL plate products."). Plaintiffs also point to different manufacturing and production processes. Hitachi Mem. at 32-35; Daido Mem. at 18.
The Commission found that tool steel and other CTL plate products may be "made in the same facilities, using at least some of the same production processes and the same employees." Views I at 18. The Commission supported this finding by pointing to evidence that one U.S. tool steel producer-ArcelorMittal-makes tool steel and other CTL plate products "in the same plants, using the same equipment, and the same employees," while another U.S. tool steel producer-Niagara-makes "other types of CTL plate on the same equipment as it uses to make tool steel." Id. at 18 & nn.38-39 (citing, inter alia , AMUSA Post-Hr'g Br., Ex. 1 at 13; Niagara U.S. Producers' Questionnaire Resp. (Oct. 13, 2016) at II-11, CR 510, Suppl. CJA,[25] ECF No. 67).
The Commission acknowledged, however, that only a minority of tool steel producers manufacture both tool steel and other CTL plate products. Id. at 18-19 & n.40.[26] The Commission also acknowledged that tool steel and other CTL plate products are not always made in the same facilities, and evidence suggested that "the *1346 largest U.S. producers of tool steel and high speed steel, which did not respond to the Commission's questionnaire, are specialty steel producers that do not make other CTL plate products." Id. at 19 & n.42 (citation omitted). The Commission recognized that tool steel may undergo "additional production processes (such as argon oxygen decarburization and electro-slag remelting) that are not used in the production of other CTL plate." Id. at 19 & n.43 (citation omitted). According to the Commission, therefore, the evidence on this factor was "mixed." Id. at 22.
Plaintiffs emphasize the additional production processes that are "typically" applicable to tool steel. Hitachi Mem. at 33-35; Daido Mem. at 18. However, the Commission recognized certain differences in production when it determined that the evidence on this factor was "mixed." Views I at 19, 22. Moreover, those differences do not undermine the Commission's specific findings regarding the existence of some shared production processes, manufacturing facilities, equipment, and employees, which are supported by substantial evidence.
Interchangeability
Plaintiffs contend this factor supports finding a clear dividing line because tool steel generally is not used in load bearing and structural applications that require welding, for which other CTL plate products are more suitable. Hitachi Mem. at 35-36; Daido Mem. at 19. Although tool steel may be used in some instances instead of other CTL plate products, it would be cost-prohibitive to do so. Hitachi Mem. at 35; Daido Mem. at 19
The Commission agreed there is a general lack of interchangeability. Views I at 20 & n.50 (citation omitted). The Commission noted, however, that "the same could be said for other specialized CTL plate products." Views I at 22. Plaintiffs do not disagree with this finding, which is supported by substantial evidence. Staff Report I at Table I-6 (noting the applications for selected types of specialized CTL plate).
Producer and Customer Perceptions
Plaintiffs contend that producers and consumers consider tool steel to be a distinct product. Hitachi Mem. at 37-38; Daido Mem. at 21. According to Plaintiffs, few U.S. customers purchase both tool steel and other CTL plate products, a minority of responsive U.S. producers reported any tool steel production, and tool steel is advertised separately from other CTL plate products. Hitachi Mem. at 37-38; Daido Mem. at 19-21.
The Commission recognized that some producers and customers consider tool steel to be a distinct product. Views I at 21. The Commission found, however, that other "producers and consumers view tool steel ... as part of a range of different types of CTL plate products," and tool steel is "marketed by some producers and distributors along with other CTL plate products." Id. at 21 & nn.52-53 (citing Comm'n Hr'g Tr. (Rev.) (Feb. 15, 2017) ("Hr'g Tr.") at 56, 111, PR 465, PJA Tab 37, CJA Tab 37, ECF No. 61-1 (statement of Robert Insetta); AMUSA Post-Hr'g Br., Exs. 1 at 18, 17 (ArcelorMittal product brochure); Nucor Corp.'s Post-Hr'g Br. (Dec. 8, 2016) ("Nucor Post-Hr'g Br."), Exs. 1, 6, 9, PR 355, CR 875, PJA Tab 20, CJA Tab 20, ECF No. 61-1; Hr'g Tr. at 115 (statement of Denton Nordhues) ). Accordingly, the Commission determined that evidence on this factor was "mixed." Id. at 22.
Daido asserts the Commission's supporting evidence consists of "conclusory statements by one of the U.S. Petitioners" that are "mostly uninformative" of the perceptions of U.S. producers and "completely uninformative as to how customers view tool steel." 20 (citing Hr'g Tr. at 56, 111). The Commission cited to statements by an *1347 ArcelorMittal official that "every type of cut-to-length plate" considered as part of the investigation, including tool steel, "is part of a broad continuum of the same product." Hr'g Tr. at 56. That statement is supported, however, by the explanation that "[a]ll [CTL] plate is produced to meet a variety of globally recognized manufacturing standards and is produced using the same equipment and on the same facilities." Id. The official further explained that tool steel and other CTL plate products "are made in the same melt shop in which we produce ... structural grades of steel. They are rolled on the same rolling mills. They are heat-treated in the same heat treat facilities, and they are produced by the same employees that produce the rest of this full spectrum of plate products." Id. at 111.
Daido further asserts that evidence of producer perceptions in the form of shared marketing "is meager" and "rebutted by evidence of tool-steel-specific trade conferences," evidence of separate marketing, and the omission of references to tool steel in the petitions. Daido Mem. at 20-21. Evidence of shared marketing included ArcelorMittal and Nucor brochures advertising several varieties of CTL plate products along with tool steel. AMUSA Post-Hr'g Br., Ex. 17; Nucor Post-Hr'g Br., Ex. 9. The Commission also noted that many types of CTL plate may be marketed separately, see Views I at 21 & n.53 (citing AMUSA Post-Hr'g Br., Ex. 1 at 18), suggesting that the degree to which CTL plate products are marketed together was not a weighty consideration in the Commission's domestic like product analysis. The evidence relied upon by Daido does not "rebut" the Commission's evidence; rather, it points to the possibility of drawing a different conclusion. It is not the court's role, however, to reweigh the evidence. See Downhole Pipe , 776 F.3d at 1377.
Lastly, Daido asserts that evidence that customers perceive tool steel to be "a distinct product was essentially unrebutted." Daido Mem. at 21 (emphasis added). Hitachi asserts "[t]here is virtually no overlap in U.S. customers for tool steel and other CTL plate." Hitachi Mem. at 37 (emphasis added). The Commission supported its findings regarding customer perceptions by citing solely to statements by an ArcelorMittal official regarding producer perceptions. Views I at 21 & n.52 (citing Hr'g Tr. at 56, 111). The Commission subsequently cited, however, to statements by an official of Leeco Steel, id. at 21 & n.53 (citing Hr'g Tr. at 115), who noted that the company buys a small amount of tool steel along with other CTL plate, Hr'g Tr. at 114-15. Officials from ArcelorMittal and Nucor likewise asserted that their customers buy tool steel and other CTL plate products. Hr'g Tr. at 114. The Commission's conclusion, therefore, regarding the "mixed" nature of the evidence on producer and customer perceptions is supported by substantial evidence. Views I at 22.
Channels of Distribution
Plaintiffs contend that tool steel and other CTL plate products are sold in different channels of distribution and to different customers. Hitachi Mem. at 38-40. Daido Mem. at 19-20, 22.
Based on the questionnaire responses, the Commission found that the majority[27] *1348 of tool steel (and high speed steel) was shipped to distributors. Views I at 19 & n.44 (citing Staff Report I , Table I-7). In contrast, the distribution of other CTL plate products was more evenly divided between distributors and end users. See Views I at 20.[28] Communications between Commission staff and a Finkl Steel official suggested, however, that the channels of tool steel distribution "are [also] likely more evenly divided than the questionnaire response data indicate." Views I at 20.[29] The Commission concluded that the "limited information in the record" suggests that tool steel "is more often sold through distributors than other CTL plate," but that it is also sold to end users. Id. at 22.
Hitachi characterizes the Commission's findings as "inexplicabl[e]" and "muddled," and asserts that "substantial record evidence demonstrat[es] that tool steel is sold in different channels of distribution. Hitachi Mem. at 38-39. But that is not the inquiry; rather, the court must examine whether the Commission's conclusion is supported by substantial evidence. In view of the record as a whole, the Commission's conclusion regarding tool steel's distribution as between distributors and end users is supported by substantial evidence.
Price
Plaintiffs assert that tool steel costs "two to four times the price of other steel CTL plate [ ], and even two times the price of other alloy CTL plate steel." Hitachi Mem. at 40-41; Daido Mem. at 23. According to Hitachi, the higher price is due to tool steel's higher alloy content and the additional manufacturing processes required to produce it. Hitachi Mem. at 42.
The Commission generally agreed, finding that "[t]ool steel ... tend[s] to command a much higher price than other CTL plate." Views I at 21. The Commission further found, however, that some alloy CTL plate products cost more than tool steel. Views I at 21 & n.55 (citing Nucor Post-Hr'g Br., Ex. 6 ¶ 8 & Attach. 2 (comparing prices for different grades of CTL plate used in different applications) ); see also Views I at 22.
Hitachi asserts the Commission's finding is unexplained "in light of the overwhelming evidence to the contrary." Hitachi Mem. at 41. Daido asserts the Commission should disregard some overlap in pricing as it "has disregarded isolated incidents of minor overlap ... in the past." Daido Mem. at 23. Once again, Plaintiffs' assertions reflect simple disagreement with the Commission's conclusions. Substantial evidence supports the Commission's findings that tool steel typically-but not always-costs more than other CTL plate products.
In sum, the Commission's conclusion that the record evidence did not support finding a clear dividing line between tool steel and other CTL plate is supported by substantial evidence. Plaintiffs essentially urge the court to draw the opposite conclusion from the evidence. However, "when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission." Nippon Steel Corp. v. United States , 458 F.3d 1345, 1358 (Fed. Cir. 2006). The court will not disturb *1349 the Commission's domestic like product determination.
III. Daido's Additional Challenges Are Unavailing
Daido contends the Commission's determination that U.S. tool steel production does not constitute a domestic industry separate from non-tool steel production is unsupported by substantial evidence and otherwise not in accordance with law. Daido Mem. at 38. Daido further contends that imports of tool steel were negligible and that the domestic tool steel industry is not materially injured or threatened with material injury by imports of Japanese tool steel. Id. at 39-41. The Government contends these arguments are premature. Gov. Resp. at 37-38.
The determination of the relevant domestic industry turns on the Commission's domestic like product determination. See 19 U.S.C. § 1677(4)(A) ("The term 'industry' means the producers as a whole of a domestic like product ...."). Because the court sustains the Commission's domestic like product finding, Daido's arguments both with regard to negligibility and material injury, which are premised on tool steel being a separate domestic like product, are unavailing.
CONCLUSION
In accordance with the foregoing, Plaintiffs' motions are denied. Judgment will be entered accordingly.

Defendant filed the confidential administrative record ("CR") at ECF No. 29, and the public administrative record ("PR") at ECF No. 30. The parties also submitted joint appendices containing record documents cited in their briefs. See Confidential JA ("CJA"), ECF No. 61; Public JA ("PJA"), ECF No. 62; Confidential Pls.' Resps. to the August 30, 2018 Court Order ("Suppl. CJA"), ECF Nos. 65, 67. The Commission's staff report and views for all countries (including Japan) are contained in the following publications filed in the administrative record: Carbon and Alloy Steel Cut-to-Length Plate from Brazil, South Africa, and Turkey , Inv. Nos. 731-TA-1319, 1326, and 1328, USITC Pub. 4664 (Jan. 2017) (Final), PR 444, ECF No. 30-1, and its corresponding confidential version, Mem. No. INV-OO-119, Inv. Nos. 701-TA-560-561 and 731-TA-1317-1328 (Final): Carbon and Alloy Steel Cut-to-Length Plate from Austria, et al. (Dec. 2016) ("Staff Report and Views I "), CR 1014, ECF No. 29-1; Carbon and Alloy Steel Cut-to-Length Plate from China , Inv. Nos. 701-TA-560 and 731-TA-1320, USITC Pub. 4675 (March 2017) (Final), PR 485, ECF No. 30-2, and its corresponding confidential version, Mem. No. INV-PP-027, Inv. Nos. 701-TA-560 and 731-TA-1320 (Final): Carbon and Alloy Steel Cut-to-Length Plate from China (Feb. 2017), CR 1016, ECF No. 29-2; Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan , Inv. Nos. 701-TA-561 and 731-TA-1317-1318, 1321-1325, and 1327, USITC Pub. 4691 (May 2017) (Final), PR 515, ECF No. 30-3, and its corresponding confidential version, Mem. No. INV-PP-055, Inv. Nos. 701-TA-561 and 731-TA-1317-1318, 1321-1325, and 1327 (Final): Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan (Apr. 2017), CR 1021, ECF No. 29-3. Because the staff report and views prepared in connection with Japan incorporate the domestic like product findings of Staff Report and Views I , the court references the Commission's findings in Staff Report and Views I unless otherwise specified. For ease of reference, the court will cite to the staff report and views, respectively, as Staff Report I and Views I . The court references the confidential versions of the record documents and ITC determinations, unless otherwise specified.

Further citations to the Tariff Act of 1930, as amended are to the relevant portions of Title 19 of U.S. Code, and all references to the U.S. Code are to the 2012 edition.

"The term 'cut-to-length' [CTL] refers to a flat plate product with a defined length." Staff Report I at I-36.

Six producers did not respond to the Commission's questionnaire. Staff Report I at III-3 n.3. One producer stated that it never received the questionnaire. Id.

[ [ ] ].

[ [ ] ]. Finkl Steel is one of the largest U.S. tool steel producers. See Staff Report I at III-2 n.3.

On March 17, 2017, the Commission published its final affirmative determination regarding carbon and alloy steel cut-to-length plate from China. Carbon and Alloy Steel Cut-to-Length Plate From China , 82 Fed. Reg. 14,230 (ITC Mar. 17, 2017), PR 488, PJA Tab 39, CJA Tab 39, ECF No. 61-1. On May 23, 2017, the Commission published its final affirmative determination regarding carbon and alloy steel cut-to-length plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan. Final Japan Determination , 82 Fed. Reg. 23,592.

High speed steel is a type of tool steel. Daido Mem. at 2.

Hitachi asserts that the Commission's finding of a domestic like product coextensive with the scope of the investigation reflects the Commission's abandonment of its statutory obligation to independently determine the domestic like product. Hitachi Mem. at 10-11; Hitachi Reply at 2-5. At oral argument, however, Hitachi acknowledged that the Commission did not summarily adopt Commerce's scope determination and did conduct its six-factor domestic like product analysis. Oral Arg. at 8:20-9:40 (reflecting the time stamp from the recording). Hitachi's argument is premised on the Commission's alleged failure to (1) adhere to agency practice, (2) explain its departure from agency practice, or (3) address the inclusion of tool steel in light of the exclusion of other CTL plate products. See Hitachi Mem. at 11-22. Accordingly, Hitachi's arguments are addressed in that fashion.

Hitachi's Attachment lists steel proceedings from 1978 to 2016. See Hitachi Mem., Attach. 1.

Safeguard investigations arise under Section 201 of the Trade Act of 1974, which governs ITC investigations into "whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." Trade Act of 1974 § 201(B)(1), 19 U.S.C. § 2251. In making like product determinations in safeguard investigations, the Commission typically considers "the physical properties of the product, its customs treatment, its manufacturing process ..., its uses, and the marketing channels through which the product is sold." 2001 Steel 201 at 30. Antidumping and countervailing duty investigations arise under Title VII of the Tariff Act of 1930, 19 U.S.C. §§ 1671 et seq. In Title VII investigations, the Commission makes domestic like product determinations after considering "(1) physical characteristics and uses; (2) common manufacturing facilities and production employees; (3) interchangeability; (4) customer perceptions; (5) channels of distribution; and, where appropriate, (6) price." Cleo , 501 F.3d at 1295. Thus, the Title VII determinations must account for several factors not considered in Section 201 proceedings.

"Title VII is narrowly aimed at remedying the specific advantages imports may be receiving from unfair trade practices," whereas "[t]he purpose of [S]ection 201 either is to prevent or remedy serious injury to domestic productive resources from all imports" entering in increased quantities. 2001 Steel 201 at 30 & n.30 (citation omitted).

Plaintiffs further point to various statements by the Commission observing differences between tool steel or stainless steel and carbon steel. See Hitachi Mem. at 13-14 (citing 1976 Stainless and Alloy Tool Steels 201 at A-3; 1983 Stainless and Alloy Tool Steels 201 at 13-14); Daido Mem. at 25-26 (citing 1976 Stainless and Alloy Tool Steels 201 at A-3; 1983 Stainless and Alloy Tool Steels 201 at A-11). However, general references to certain distinctions between steel products made in one investigation on the basis of the record in that investigation do not bind the Commission in subsequent determinations made on different records and in response to different arguments. See Citrosuco Paulista , 12 CIT at 1209, 704 F.Supp. at 1088. With regard to the 1983 safeguard investigation, Daido also appears to find it significant that the Commission did not include other carbon and alloy products as part of the product that is like tool steel. Daido Mem. at 26. However, there is no indication that any interested party raised arguments that would have prompted the Commission to consider the inclusion of those products.

See generally Cold-Rolled Steel Flat Products from Brazil, India, Korea, Russia, and the United Kingdom , Inv. Nos. 701-TA-540, 542-544 and 731-TA-1283, 1285, 1287, and 1289-1290, USITC Pub. 4637 (Sept. 2016) (Final); Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom , Inv. Nos. 701-TA-545-547 and 731 TA 1291-1297, USITC Pub. 4638 (Sept. 2016) (Final); Cold-Rolled Steel Flat Products from China and Japan , Inv. Nos. 701-TA-541 and 731-TA-1284 and 1286, USITC Pub. 4619 (July 2016) (Final); Cold-Rolled Steel Flat Products from Brazil, China, India, Japan, Korea, Netherlands, Russia, and the United Kingdom , Inv. Nos. 701-TA-540-544 and 731-TA-1283-1290, USITC Pub. 4564 (Sept. 2015) (Prelim.); Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia , Inv. Nos. 701-TA-384 and 731-TA-806-808, USITC Pub. 4237 (June 2011) (Second Review); Certain Cold-Rolled Steel Products from Australia, India, Japan, Sweden, and Thailand , Inv. Nos. 731-TA-965, 971-972, 979, and 981, USITC Pub. 3536 (Sept. 2002) (Final); Certain Cold-Rolled Steel Products from Argentina, Belgium, Brazil, China, France, Germany, Korea, the Netherlands, New Zealand, Russia, South Africa, Spain, Taiwan, Turkey, and Venezuela , Inv. Nos. 701-TA-423-425 and 731-TA-964, 966-970, 973-978, 980, and 982-983, USITC Pub. 3551 (Nov. 2002) (Final); Hot Rolled Steel Products from China, India, Indonesia, Kazakhstan, the Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine , Inv. Nos. 701-TA-405-408 and 731-TA-899-904 and 906-908, USITC Pub. 3468 (Nov. 2001) (Final); Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, Japan, and Korea , Inv. Nos. 701-TA-388-391 and 731-TA-816-821, USITC Pub. 3816 (Nov. 2005) (Reviews); Hot Rolled Steel Products from Argentina and South Africa , Inv. Nos. 701-TA-404 and 731-TA-898 and 905, USITC Pub. 3446 (Aug. 2001) (Final); Certain Cold-Rolled Steel Products from Argentina, Brazil, Japan, Russia, South Africa, and Thailand , Inv. Nos. 701-TA-393 and 731-TA-829-830, 833-834, 836, and 838, USITC Pub. 3283 (Mar. 2000) (Final); Certain Cold-Rolled Steel Products from Turkey and Venezuela , Inv. Nos. 731-TA-839-840, USITC Pub. 3297 (May 2000) (Final); Certain Carbon Steel Plate from China, Russia, South Africa, and Ukraine , Inv. Nos. 731-TA-753-756, USITC Pub. 3076 (Dec. 1997) (Final); Certain Flat-Rolled Carbon Steel Products from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom , Inv. Nos. 701-TA-319-332, 334, 336-342, 344, and 347-353 and 731-TA-573-579, 581-592, 594-597, 599-609, and 612-619, USITC Pub. 2664 (Aug. 1993) (Final).

At oral argument, Plaintiffs emphasized their view that the Commission implicitly found stainless steel to be a separate like product, and faulted the Commission for failing to explain the correctness of that finding in light of tool steel's inclusion in the domestic like product and the similarities between tool steel and stainless steel. Oral Arg. 14:40-16:30. The Commission was not, however, required to address stainless steel because the Tool Steel Respondents never put the status of stainless steel at issue by, for example, arguing that the Commission should expand the domestic like product beyond the scope to include stainless steel; indeed, Plaintiffs agree that stainless steel should be considered a separate like product. See id. Instead, Plaintiffs focused their arguments on tool steel as a separate like product, which the Commission squarely addressed. Daido's argument that the Commission departed from its past treatment of tool steel as more like stainless steel than other types of carbon and alloy steel also fails. Daido Mem. at 37 (asserting that "no rational argument or factual developments have been presented for now finding that tool steel is more similar to other carbon and alloy steel than it is to stainless steel"). The Commission made no such finding because tool steel's relative similarity to stainless steel as compared to the carbon and alloy steel products under investigation was irrelevant to its determination.

In certain circumstances involving ambiguous scope language, to determine whether imported merchandise is subject to an antidumping or countervailing duty order Commerce may consider "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2). Although the (k)(2) are similar to the Commission's six factors, see Cleo , 501 F.3d at 1295 ; supra pp. 5-6, as the Government points out, "the information pertaining to the subject merchandise produced abroad will not necessarily apply to the domestically-produced product." Gov. Resp. at 12 n.8.

Moreover, Hitachi and other proponents of this submission made no effort to distinguish any information that might have been relevant to the Commission's analysis and, instead, expected the Commission to wade through the submission in search of anything relevant.

Hitachi also contends that the Commission failed to fulfill its obligation under 19 U.S.C. § 1677(7)(C)(iii) to "evaluate all relevant factors which have a bearing on the state of the industry." Hitachi Mem. at 22-23. As the Government points out, however, the statute instructs the Commission to "evaluate all relevant economic factors which [bear] on the state of the industry in the United States" as part of its inquiry into the impact of the subject imports on the domestic industry. 19 U.S.C. § 1677(7)(C)(iii) (emphasis added); Gov. Resp. at 15 n.10. This inquiry forms part of the Commission's material injury determination, which is subject to its domestic like product and subsequent domestic industry determinations.

At oral argument, Plaintiffs asserted the Commission could have utilized its subpoena power to gather additional information. Oral Arg. at 1:40:30-1:40:45; see also 19 U.S.C. § 1333(a) (setting forth the Commission's subpoena power); 19 C.F.R. § 207.8. Time constraints limit the Commission's practical ability to utilize its subpoena power in AD/CVD proceedings. See, e.g. , Chevron U.S.A., Inc. v. United States , 11 CIT 76, 79 (1987) (citing Atl. Sugar, Ltd. v. United States , 744 F.2d 1556, 1560 (Fed. Cir. 1984) ). In any event, this argument was neither exhausted before the Commission nor addressed in Plaintiffs' court filings. Accordingly, the court does not further address it. See, e.g. , 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."); Novosteel SA v. United States , 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("[A] arty waives arguments based on what appears [or does not appear] in its brief.").

At oral argument, Plaintiffs asserted that the Commission's determination cannot be based on substantial evidence because it is based on data from companies accounting for roughly ten percent of domestic tool steel production; in other words, an insubstantial amount of the potentially available data. Oral Arg. at 36:50-37:03, 45:12-45:20; see also Views I at 19 n.42 (noting the Tool Steel Respondents' similar assertion). Plaintiffs' assertion is belied by the fact that the Commission also took account of information and data obtained through correspondence and telephone communication with certain tool steel producers which had not responded to the domestic producer questionnaire.

Hitachi asserts that carbon and other alloy steel grades contain alloying elements that range from [ [ ] ] by weight, whereas tool steel contains alloying elements ranging from [ [ ] ] by weight. Hitachi Mem. at 28. As discussed infra , the Commission considered this data but found that the existence of some CTL plate products with relatively high levels of alloy and at least one type of tool steel with a relatively low alloy level was did not necessitate distinguishing tool steel on this basis.

Relevant mechanical properties that differ between tool steel and other CTL plate include wear resistance, toughness, hot or red hardness, general hardness, ductability, and weldability. Hitachi Mem. at 28-29; Daido Mem. at 15.

Daido argues that the Commission's conclusion failed to account for differences in mechanical properties. Daido Mem. at 17. Although the Commission did not expressly mention mechanical properties in its conclusion, Views I at 22, it considered its implications in its discussion of tool steel's physical characteristics, id. at 18. The Commission further noted that the evidence as to this factor was "mixed," id. at 23, thereby accounting for evidence demonstrating differences among the products.

Daido argues that "a single example of low alloy tool steel and a single example of high alloy non-tool steel plate" do not undermine the "general rule" that tool steel has a higher alloy content than other CTL plate. Daido Mem. at 16 (noting that the Commission has relied upon general rules in past determinations to find separate like products despite some overlap in product features) (citations omitted). It is not the court's role, however, to reweigh the evidence demonstrating shared alloy content against the evidence demonstrating tool steel's generally higher alloy content. See, e.g. , Downhole Pipe , 776 F.3d at 1377.

There is no tab number for this document.

"AMUSA, Nucor, and Niagara accounted for [ [ ] ] percent of the [ [ ] ] short tons of tool steel and high speed steel produced by the four reporting producers in 2015." Views I at 18-19 & n.40 (citation omitted).

According to the Commission, [ [ ] ] percent of tool steel and high speed steel was shipped to distributors in 2015. Views I at 19 & n.44 (citing Staff Report I at Table I-7). However, the staff report indicates that [ [ ] ] percent of tool steel and high speed steel went to distributors in calendar year 2015, and [ [ ] ] percent went to distributors for the period January to September 2015. Staff Report I at Table I-7. This apparent discrepancy does not undermine the Commission's finding that "[t]he great majority" of shipments of tool steel and high speed steel reported by the questionnaire respondents went to distributors. Views I at 19.

[ [ ] ] percent of all other CTL plate was shipped to distributors in calendar year 2015, and [ [ ] ] percent was shipped to end users. Id. at 20; Staff Report I at Table I-7.

Finkl Steel informed the Commission that [ [ ] ] percent of its tool steel was sold to end users while [ [ ] ] percent was sold to distributors. Views I at 20 & n.46 (citing Finkl Steel E-Mail Req. for Information (Dec. 16, 2016), CR 983, PJA Tab 25, CJA Tab 25, ECF No. 61-1).